IN RE NEW JERSEY BOARD OF PUBLIC UTILITIES, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION-EMERGENCY REDIRECTION OF SOLID WASTE FLOW IN CAPE MAY COUNTY.

Superior Court of New Jersey
Appellate Division

Submitted March 25, 1985—Decided April 19, 1985.

546

Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.

*Higgins & Slachetka,* attorneys for appellant Cape May County Municipal Utilities Authority (*Thomas S. Higgins, Joseph J. Slachetka* and *Howard C. Long, Jr.,* on the brief).

*Joseph Ferrante, Jr.,* attorney for respondent Foundations and Structures, Inc.

*Stryker, Tams & Dill,* attorneys for respondent Borough of Woodbine (*Richard B. McGlynn,* of counsel; *Peter J. Guffin,* on the brief).

*Irwin I. Kimmelman,* Attorney General, attorney for respondents Board of Public Utilities and Department of Environmental Protection (*Deborah T. Poritz,* Deputy Attorney General, of counsel; *Dale Laster Lessne,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MORTON I. GREENBERG, P.J.A.D.

This matter comes on before the court on appeal from a joint order of the New Jersey Department of Environmental Protection (DEP) and the New Jersey Board of Public Utilities (BPU), dated May 15, 1984, redirecting solid waste flow in Cape May County, New Jersey, for a period of 180 days. The matter is complex so that an understanding of the case requires that its factual and procedural history be set forth at length. Implicated in the case are substantive and procedural questions concerning the validity of the order. We conclude that while the case may be technically moot, we should nevertheless decide the substantive issues raised. However we will not consider the procedural questions as the situation giving rise to them is not likely to be repeated.

In 1970 the Legislature adopted the New Jersey Solid Waste Management Act, *L.*1970, *c.* 39, *N.J.S.A.* 13:1E–1 *et seq.,* requiring each county to develop and formulate a solid waste management plan. *N.J.S.A.* 13:1E–20. However prior to 1979 Cape May County had not adopted any solid waste management plan. Thus solid waste in the county was being disposed of at that

time in various landfills expected to reach their capacity by 1986. In recognition of the problem and in conformity with the law, the county adopted a Solid Waste Management Plan in 1979. This plan after being modified by the county was further modified and approved by the DEP on February 4, 1981. The plan contemplated that local landfills including one operated by respondent Foundations and Structures (F & S) on municipally owned land in Woodbine were to close by December 31, 1982. The F & S landfill received solid waste from Avalon, Sea Isle City and Woodbine and was under the regulatory jurisdiction of the BPU.[1] After December 31, 1982 solid waste was to be disposed of at a regional landfill to be constructed and in operation by January 1, 1983. This regional landfill was to be owned and operated by appellant Cape May County Municipal Utilities Authority (CMCMUA) which was designated as the implementing agency for the plan by the freeholders. On December 6, 1982 the BPU and DEP adopted interdistrict and intradistrict solid waste flow regulations pursuant to the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 *et seq.*, and the Solid Waste Utility Control Act, *N.J.S.A.* 48:13A–1 *et seq. See N.J. A.C.* 7:26–6.1 *et seq.* While these regulations are state-wide, we are concerned with the fact that they implement the Cape May County Solid Waste Management Plan and provide for interim direction of solid waste flow prior to the completion of the regional landfill. These interim provisions allowed continuation of the Woodbine facility for receipt of waste from Avalon, Sea Isle City and Woodbine. *N.J.A.C.* 7:26–6.5(e).

Inasmuch as the regional facility was scheduled to supersede the existing landfills, F & S contemplated closing its Woodbine landfill, a procedure which it initially thought would pose no major problems. While F & S was required to comply with State closure regulations, it believed it could do so by placing two feet of cover on the landfill and grading and seeding it.

---

[1] It seems also to have received limited amounts of waste from Upper Township.

Additionally it anticipated drilling some monitoring wells. Overall F & S expected total termination expenses of $245,000. In fact the regional landfill was not ready by January 1, 1983. Thus the opening date was postponed until July 1, 1983, a date also not met. Subsequently an opening date of April 1, 1984, was anticipated.

The delays in opening the regional landfill and closing the local operations proved to have an enormous economic significance. In May 1983 the DEP promulgated new and more comprehensive regulations governing the closure and post-closure care and record-keeping requirements for landfills. F & S recognized the impact of these changes and thus wrote to the DEP on July 21, 1983 stating that it had insufficient funds to pay for the new requirements and because of the imminent closing of its operation it would have inadequate time to generate additional funds to cover the enhanced costs. It claimed that as of July 21, 1983 it had only $51,838 in its landfill closure escrow account with no alternative funds available. F & S said that Woodbine, which owned the landfill site, was in tight financial condition and could not be expected to pay any closure expenses.

Notwithstanding these financial problems the DEP notified F & S in September 1983 of its obligation to comply with the new closure requirements. Meetings between representatives of the DEP and F & S ensued concerning the details of the new rules. Then on January 17, 1984 the DEP issued an order specifying the steps necessary for F & S to comply with the new regulations. These steps included submission of a supplemental engineering closure design which would include plans for final grading, operations, a two-foot permeable cap covered with 12 inches of soil to support vegetative growth, storm water management, cross sections, construction detail sheets and methane gas evacuation. The matter was further complicated by requirements that F & S comply with the Pinelands Comprehensive Management Plan and obtain a New Jersey Pollutant Discharge Elimination System permit. Further F & S

was required to install scales and to submit a closure and post-closure financial plan.

The adverse financial impact of these plans on F & S was clear. It estimated the cost to satisfy the new regulations would be $1,992,000. Quite understandably F & S sought relief in this situation. On March 2, 1984 it filed a verified petition in support of emergency relief with the BPU seeking: interim rate relief to enable it to recover the costs of closing the landfill in accordance with the new DEP regulations; continuation of its waste flow to enable it to comply with the DEP regulations; and an amendment to the waste flow regulations to permit continuation of waste flow to the Woodbine landfill. It is not clear from the record whether notice of this petition was given to the CMCMUA. However, even before the petition was filed the DEP had encouraged the CMCMUA to meet with officials from the DEP, Woodbine and F & S to discuss F & S's problem. Further we note that the county seems to have recognized the problem for at that time the freeholders were considering adoption of an amendment to their plan which would have redirected waste then being disposed of in another landfill to the F & S Woodbine site pending the opening of the regional landfill.

Eventually F & S became aware that the county would not support the continued operation of the Woodbine landfill. Thus on April 4, 1984 F & S requested a declaratory ruling from the BPU suspending the operative date of the provision in the waste flow regulations, *N.J.A.C.* 7:26–6.5(e)(7), which directed that the waste previously placed in the Woodbine site be redirected to the regional landfill when it opened. F & S desired the suspension pending an agreement allowing it to operate following the opening of the regional landfill.

On April 9, 1984 F & S filed an amendment to its verified petition of March 2, 1984 pursuant to *N.J.A.C.* 14:1–6.5 seeking *ex parte* emergent relief as requested in the April 4 letter. The amendment included: (1) a pro forma statement of income for

the period April 1 to June 30, 1984 reflecting a loss of $1,935,-715;  (2) a pro forma balance sheet as of June 30, 1984 showing that its total liabilities were greater than its total current and accrued assets;  (3) a second revised rate schedule no. 1;  and (4) a supporting affidavit by William E. Monaghan, its president, representing that cessation of the landfill's waste flow would prevent F & S and Woodbine from closing the landfill in an environmentally sound manner and from maintaining proper closure.

Joseph Ferrante, Jr., the attorney for F & S, served a copy of the amendment to its petition on George Marinakis, a representative of the CMCMUA, by certified mail on April 9, 1984 and the CMCMUA received this material on April 11, 1984.  According to John J. Pislor, a BPU official, on April 9, 1984 he, Pislor, notified Theodore O'Neill, waste manager of the CMCMUA of the F & S applications.  Pislor indicates he told O'Neill that the BPU would consider the matter on April 12, 1984.  O'Neill, however, denies receiving this call.

At a meeting held on April 12, 1984 the BPU considered and acted upon the F & S matter.  The BPU had given formal notice of the meeting pursuant to *N.J.S.A.* 10:4–18.  The BPU unanimously determined to issue an order granting an emergency redirection of waste flow from the CMCMUA regional landfill to the F & S landfill for a period of 180 days after the opening of the regional landfill.  The BPU granted this relief because of its analysis of the financial status of F & S.  The relief, however, was conditioned upon the DEP accepting the order inasmuch as the relief could only be granted upon a determination by the DEP that an emergency situation existed. The 180-day period was the longest time during which a redirection could be allowed without amendment to the Cape May County Solid Waste Management Plan.  *N.J.A.C.* 7:26–6.7(b)(3).

On April 30, 1984 the BPU issued an interim order reflecting the April 12, 1984 determination.  The BPU concluded it had the authority and duty to fashion economic relief for F & S to

ensure it had the economic capacity to effectuate the improvements the DEP required for closure. The BPU made the following findings:

(1) Petitioner [F & S], by virtue of its operation of a sanitary landfill owned by and leased from the Borough of Woodbine, is a public utility subject to the jurisdiction of the Board pursuant to *N.J.S.A.* 48:13A–1 *et seq.* and the Department [of Environmental Protection] pursuant to *N.J.S.A.* 13:1E–1 *et seq.;*

(2) By promulgation of joint rules for interdistrict and intradistrict solid waste flow, duly adopted on December 6, 1982, solid waste heretofore directed to petitioner's facility will be redirected to the Cape May County regional landfill when it becomes operational;

(3) The Cape May County regional landfill is scheduled to become operational on or about May 15, 1984, at which time, pursuant to *N.J.A.C.* 7:26–6.5(e)(7) petitioner will no longer be receiving solid waste at its facility;

(4) The Department in exercising its jurisdiction over environmental aspects of petitioner's operation pursuant to *N.J.S.A.* 13:1E–1 *et seq.*, has determined a number of environmental improvements to be necessary to petitioner's facility so as to satisfy the requirements of *N.J.S.A.* 13:1E–100 *et seq.;* [The BPU referred to DEP's January 17, 1984 order on this point.]

(5) Pursuant to *N.J.S.A.* 13:1E–100 *et seq.*, petitioner is required to submit Closure and Post-Closure Financial Plans consistent with the Department's Administrative Order of January 17, 1984;

(6) Subject to verification at hearing, environmental improvements mandated by the Department will cost petitioner $1,992,000;

(7) Recovery of such costs will be effectively precluded by virtue of the operation of *N.J.A.C.* 7:26–6.5(e)(7), in that petitioner will no longer be receiving solid waste at its facility after the Cape May County regional landfill becomes operational on or about May 15, 1984;

(8) By virtue of the operation of *N.J.A.C.* 7:26–6.5(e)(7), petitioner will be unable to submit a Closure and Post-Closure Financial Plan consistent with the Department's directives;

(9) Petitioner's inability to submit such plan will preclude it from continuing to provide safe, adequate and proper service in an environmentally sound manner as mandated by *N.J.S.A.* 48:2–23;

(10) It is therefore appropriate to modify the subject rule so as to permit petitioner the opportunity to receive solid waste after Cape May County regional landfill becomes operational;

(11) That until such modification is effected or until such other remedial action as is deemed appropriate by the Department is taken, an emergency economic condition will exist at the Foundations and Structures sanitary landfill facility, Woodbine Borough, Cape May County.

The BPU determined that F & S must be provided the opportunity to recover the costs necessary to satisfy the DEP's closure requirements. The BPU also found that it was not only unreasonable but impossible to expect the costs to be recovered by May 15, 1984, the then contemplated date for the opening of the regional facility. Thus, the BPU determined that an emergency redirection of waste flow to Woodbine after May 15, 1984 was warranted. Nonetheless, the BPU concluded that *N.J.A.C.* 7:26–6.7 did not permit it unilaterally to redirect the flow. Thus it provided for an order allowing an emergency waste flow redirection to be prepared and forwarded to the DEP for its review. The concern of the BPU was reflected in its direction to its staff to meet with representatives of the DEP, Cape May County, F & S and the municipalities affected to attempt to devise a means whereby F & S could remain operational after the expiration of the 180 days so that F & S could satisfy DEP's closure requirements. Finally, the BPU agreed to handle F & S's request for interim rate relief on an expedited basis once the DEP approved the emergency waste flow redirection. The BPU reached these results though fully recognizing the interest of the CMCMUA to receive all waste generated within its operational area at the regional landfill upon its being opened. However the BPU concluded that the interim order was a proper balance of the CMCMUA's interest with the BPU's duty to regulate economically F & S to ensure proper, environmentally sound service.

Subsequent to the issuance of the interim order a public hearing was held in Woodbine on the proposed rate increase for F & S. Following the hearing the BPU approved a stipulation agreed upon by rate counsel, F & S, the BPU staff and Woodbine for an interim increase. The rates were to be equivalent to those charged at the regional landfill.

On May 15, 1984 the DEP adopted the interim order of April 30, 1984 proposed by the BPU. The BPU and DEP on May 15, 1984 jointly issued the order which permitted F & S to continue to accept solid waste from municipalities in its service area for

a period of 180 days. The DEP and BPU concluded that, in consideration of the needed environmental improvements at the F & S site and the inability of F & S to effect the improvements absent a continuing revenue stream, the emergency redirection order was in the best interest of the citizens of Cape May County and the State of New Jersey. Although it does not appear that the DEP held any kind of hearing prior to adopting this order, the order provided for a 30-day period wherein written comments on the order would be accepted. It appears that the CMCMUA commented on the order within the 30-day period. However the 180-day redirection to the Woodbine facility stood.

On May 22, 1984 the CMCMUA filed a notice of appeal to this court from the joint order of the DEP and BPU of May 15, 1984 granting F & S an emergency redirection of solid waste flow for 180 days. On June 4, 1984 the CMCMUA filed a motion in this court for temporary relief from the joint BPU/DEP order. By our order of June 8, 1984 we denied this motion. Thus the redirection to F & S remained effective.

The joint order redirecting waste was due to expire on November 11, 1984. However on October 12, 1984 the Borough of Woodbine, as intervenor, filed a verified motion with the BPU for emergency relief seeking further suspension of *N.J. A.C.* 7:26–6.5(e)(7).[2] F & S filed a petition ancillary to this motion requesting like relief. In response the BPU on November 8, 1984 reiterated its finding of the existence of an economic emergency at the F & S landfill and it thus issued an order urging the DEP to take remedial action. The BPU recommended either a continuation of the May 15 redirection order, or a direction by the DEP to Cape May County requiring the county to submit an amendment to the Solid Waste Manage-

---

[2]These proceedings having been taken after the filing of the appeal in this case are not properly part of the record here. But we now expand the record to include them. *See First Jersey Securities, Inc. v. S.E.C.,* 194 *N.J.Super.* 284, 293 n. 5 (App.Div.1984).

ment Plan to provide for continued direction of solid waste to the Woodbine landfill until the F & S landfill reaches capacity or F & S is able to meet the DEP closure requirements. The record in this case does not disclose what, if any, action the DEP took or is taking on this matter. However we are aware from separate appeals taken to this court which we judicially notice (*see Evid.R.* 9(2)(b)) that on November 26, 1984 the Commissioner of Environmental Protection declined to concur with the BPU order of November 8, 1984.

The four issues raised on this appeal are whether the appeal is moot, whether the CMCMUA has standing to challenge the order, whether the order was lawfully issued or was arbitrary and capricious and whether the CMCMUA was denied due process in the issuance of the order.

■■ We realize that in view of the expiration of the 180-day redirection period this appeal may be moot. Nevertheless we conclude that we should consider the substantive issues on the merits. F & S and the Borough of Woodbine have already filed one request for an extension of the redirection order and the BPU has again recommended to the DEP that F & S be granted a redirection of waste flow thereby exempting F & S from the operation of *N.J.A.C.* 7:26–6.5(e)(7), a recommendation the DEP has rejected. Appeals have been taken from the DEP action. Thus even though the initial redirection order has expired, the parties continue to have a financial stake in the controversy. Possibly a decision by us as to the validity *vel non* of the order of May 15, 1984 will be germane in the later appeals. Moreover, the bypassing of the regional plan presents a matter of particular concern to the public interest that should be addressed. In concluding that we should consider the substantive issues on the merits we note that we are not confined by the strict "case or controversy" requirements of the federal courts. *See In re Boardwalk Regency Corp. Casino License,* 90 *N.J.* 361, 367 (1982), app. dism. *sub nom. Perlman v. Att'y Gen. of N.J.,* 459 *U.S.* 1081, 103 *S.Ct.* 562, 74 *L.Ed.*2d 927

(1982). Thus we may decide a case which is technically moot. *In re Boardwalk Regency Corp. Casino License, supra,* 90 *N.J.* at 368. However we will not consider the due process arguments of the CMCMUA. These arguments relate to the notice given it of the administrative proceedings leading to the order of May 15, 1984. We see no reason to believe that in the future similar issues relating to notice will arise.

■■ F & S contends that the CMCMUA lacks standing to appeal. We disagree. Standing requires that a litigant have a sufficient stake and real adverseness with respect to the subject matter of the litigation, and a substantial likelihood that some harm will fall upon it in the event of an unfavorable decision. *N.J. Chamb. Commerce v. N.J. Elec. Law Enforce. Comm.,* 82 *N.J.* 57, 67 (1980). Clearly the decision adversely impacted on the CMCMUA for it deprived the CMCMUA of revenues.

The CMCMUA contends the order of May 15, 1984 was arbitrary, capricious and unreasonable, *ultra vires,* and without legal or factual basis. It asserts that the DEP and BPU could only order a redirection of waste to the F & S landfill if the DEP determined there was an emergency condition warranting redirection. *See N.J.A.C.* 7:26–6.7. The CMCMUA submits the facts do not support the DEP's finding of an emergency because the only emergency was economic hardship of F & S. It maintains that *N.J.A.C.* 7:26–6.7 was not designed to protect an operator's economic interest. Moreover, the CMCMUA contends that the DEP and BPU failed to consider the harm to the public interest caused by allowing F & S to continue operating an inefficient landfill.

The DEP and BPU contend they properly exercised powers under *N.J.A.C.* 7:26–6.7 in issuing the emergency redirection of solid waste flow because the order enabled F & S to earn funds towards closing the landfill in accordance with DEP closure requirements. Moreover they argue that *N.J.A.C.* 7:26–6.7 was intended to provide broad flexibility in the exercise of emergen-

cy redirection. They submit the reference in the regulation to unanticipated closure as one example of an emergency condition is evidence that an inability to close in accordance with DEP requirements constitutes an emergency. F & S contends the joint order was properly based on facts in the record because it was required to make substantial improvements to comply with DEP closure requirements but did not have the means to generate the required revenues due to the scheduled closing under the waste flow rules. Woodbine contends the facts show that by remaining open after the scheduled opening of the regional landfill, F & S could accumulate funds for closing. Moreover, Woodbine asserts the DEP and BPU properly balanced the need for F & S to stay open against the impact on the CMCMUA landfill and determined it was necessary to redirect waste flow to the F & S landfill.

We conclude that the adoption of the interim order was not *ultra vires*. Administrative regulations are customarily afforded a rebuttable presumption of validity and thus a finding that an order is *ultra vires* is disfavored. *A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't*, 90 *N.J.* 666, 683 (1982). Moreover, the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation. *Id.* at 683–684.

*N.J.S.A.* 48:13A–2 provides:

The Legislature finds and declares that the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection, disposal and utilization service; that such service will more likely be achieved if the Public Utility Commission is charged with the duty of setting and enforcing standards and rates for regulating economic aspects of solid waste collection, disposal and utilization service; and that the exercise of any

power herein provided for shall be deemed to be in the public interest and for a
public purpose.

Thus the Supreme Court has indicated that the Legislature
intends the BPU to have the role in statewide solid waste
management to assess and regulate the economic aspects of the
industry. *A.A. Mastrangelo, Inc. v. Environmental Protec.
Dep't, supra,* 90 *N.J.* at 681.

Additionally, *N.J.S.A.* 48:2–23 provides:

The board may, after hearing, upon notice, by order in writing, require any
public utility to furnish safe, adequate and proper service, including furnishing
and performance of service in a manner that tends to conserve and preserve the
quality of the environment and prevent the pollution of the waters, land and air
of this State, and to maintain its property and equipment in such condition as to
enable it to do so.

The board may, pending any such proceedings, require any public utility to
continue to furnish service and to maintain its property and equipment in such
condition as to enable it to do so.

In view of these statutes we agree with the conclusion of the
BPU that it was the Legislature's intent to vest it with the
powers necessary to ensure that disposal operators subject to
its jurisdiction have the economic capacity to effectuate the
environmental mandates of the DEP. Thus *N.J.A.C.* 7:26–6.7
authorizing redirection order is valid and the order of May 15,
1984 was not *ultra vires.*

Of course our determination that the order was within
the power of the BPU does not terminate our substantive
inquiry. We must also ascertain whether there is sufficient
credible competent evidence in the record to support the conclu-
sion of the BPU and the DEP. *See Goodman v. London
Metals Exchange, Inc.,* 86 *N.J.* 19, 28–29 (1981). We recognize,
however, that in viewing the record we must afford a presump-
tion of reasonableness to the administrative action. *See A.A.
Mastrangelo, Inc. v. Environmental Protect. Dep't, supra,* 90
*N.J.* at 687. The basis for the authorization was the determina-
tion by the BPU and DEP that the F & S landfill needed

environmental improvements prior to closing the cost of which could not be met by F & S without a continuing revenue stream. Thus the BPU and DEP thought that an economic emergency condition existed which would directly impact on the environment. Therefore they found that the emergency redirection of waste flow to the Woodbine landfill was in the best interests of the public and the State of New Jersey.

The record clearly supports these conclusions. On January 17, 1984 the DEP issued an administrative order specifying the steps necessary under the new regulations for closure of the F & S landfill. Implementation of the order would increase the closing costs of F & S to an estimated amount of $1,992,000 compared to the previously anticipated cost of approximately $245,000. Further its pro forma statement of income for the period April 1 to June 30, 1984 reflected a loss of $1,935,715, and its pro forma balance sheet as of June 30, 1984 showed its total liabilities exceeded its assets. From this evidence it was reasonable for the BPU and DEP to conclude that F & S would not be able to finance the required improvements for closure. This inability could effectively preclude F & S from continuing to provide safe, adequate and proper service, which includes closure and post-closure monitoring, in an environmentally sound manner. Thus the joint BPU and DEP order redirecting waste to F & S for a period of 180 days was founded on sufficient credible competent evidence and was not arbitrary, capricious nor unreasonable and it must be upheld.

In conclusion we make the following determinations: (1) the CMCMUA has standing to appeal the joint order; (2) we will consider the substantive but not the procedural aspect of the appeal; (3) the order is valid. Thus we affirm the order of May 15, 1984.[3]

---

[3]The parties should not infer from our opinion that we are expressing any opinion on the merits of the later appeals.