717 A.2d 456 (1998)
COLTS RUN CIVIC ASSOCIATION, an Association Including Nate and Patrice Falanga, Rocco and Angela Debenedetto, Christopher and Jill Whalen, Mark and Reem Pashan, Thomas and Betsy Dellisola, Glenn and Patricia Moschella, Robert and Patricia Durski, Nicholas and Darlene Bosco, Richard and Roseanne Prito, Richards and Laurie Emanuele, and Kenneth and Kathleen Lewandowski, Plaintiffs,
v.
COLTS NECK TOWNSHIP ZONING BOARD OF ADJUSTMENT and John Lucchese, Defendants.
Superior Court of New Jersey, Law Division, Monmouth County.
Decided June 29, 1998.
*458 Bernard M. Reilly, Red Bank, for Plaintiffs (Dowd & Reilly, attorneys; Mr. Reilly, on the brief).
Michael B. Steib, Middletown, for Defendant Zoning Board of Adjustment (Mr. Steib, on the brief).
Jeffrey J. Rea, Westfield, for Defendant John Lucchese (Mr. Rea, of counsel; Peter M. Jacques, Short Hills, on the brief).
*457 HAYSER, J.T.C., temporarily assigned.
Is the maintenance of a "domestic animal shelter," in this case a pigeon coop, as a hobby activity a permitted accessory use to a residential use in a zoning district providing for a mixture of residential and agricultural uses? That is the principal question presented in this appeal of an affirmative interpretation made by the defendant Zoning Board of Adjustment herein.
Most essential operative facts are not in dispute. Defendant John Lucchese is the owner of a certain single-family residence located in a certain development in the Township of Colts Neck and denoted as the "Colts Run Development." This development is further located in the Township's "AG" or Agricultural District, and was further developed under a residential cluster plan. Moreover, while permitted uses include residential uses, the stated purpose of the zoning plan for this district includes the "continuation of farming." See, Section 707.2A of the Township's Development Regulation Ordinances.
*459 On or about August 23, 1996, defendant Lucchese contracted to purchase the above-described residential property. He apparently intended to maintain "racing pigeons" in a coop structure on the property.[1]
Thereafter, on or about October 30, 1996, the defendant was advised that his proposed activity on the property was not a permitted accessory use and that he would have to make application to the defendant Zoning Board of Adjustment for relief.
Subsequently, defendant Lucchese filed an application with the defendant Board, requesting an interpretation pursuant to N.J.S.A. 40:55D-70b, or, in the alternative, a use variance pursuant to N.J.S.A. 40:55D-70d, to permit the construction of a "domestic animal shelter" on the residential property. Hearings were conducted as to the application on February 20 and March 20, 1997.
On April 9, 1997, the governing body of the Township introduced Township Ordinance 1997-10, which essentially would prohibit the proposed accessory use. On April 17, 1997, the defendant Zoning Board of Adjustment adopted a resolution finding that the existing Ordinance permitted the construction of the contemplated "domestic animal shelter" as an accessory use, and that no variance was required. On April 22, 1997, defendant Lucchese filed for a construction permit, and while that application was pending, Township Ordinance 1997-10 was enacted, on May 14, 1997. Defendant's construction permit application was denied on or about May 16, 1997, Township officials now indicating that a use variance would be required due to the adoption of the Ordinance.[2]
On May 5, 1997, the plaintiffs filed a complaint in lieu of prerogative writs and for injunctive relief, seeking to set aside the interpretation. On August 29, 1997, a third-party complaint was filed. An amended third-party complaint was filed on December 19, 1997. A pretrial order was entered on March 31, 1998.

THE SCOPE OF THIS COURT'S REVIEW
As indicated above, defendant Lucchese applied to the defendant Board for an interpretation under N.J.S.A. 40:55D-70b, which provides, in relevant part, that the Board is permitted to "[h]ear and decide requests for interpretation of the zoning ... ordinance..."
The exercise of the statutory interpretive power is not dependent upon any implementing provision of a local ordinance. Cherney v. Matawan Zoning Bd. of Adj., 221 N.J.Super. 141, 145 note 1, 534 A.2d 41, (App.Div.1987). Once made, the board's decision is final and binding as to all interested parties, including enforcement officials, unless successfully appealed. Inherent in the exercise of this power is the realization that the board is not merely an administrative agency, but is also empowered to determine, in the first instance, certain questions of law. Centennial Land & Dev. Co. v. Tp. of Medford, 165 N.J.Super. 220, 397 A.2d 1136 (Law Div.1979).[3]
*460 While a reviewing court should give certain deference to a municipal agency's informed interpretation of its ordinances, such determinations are subject to de novo review by the court. Wyzykowski v. Rizas, 254 N.J.Super. 28, 38, 603 A.2d 53 (App.Div. 1992), rev'd on other grounds 132 N.J. 509, 518-20, 626 A.2d 406 (1993). See also, Grancagnola v. Planning Bd., 221 N.J.Super. 71, 533 A.2d 982 (App.Div.1987); Cherney, supra, 221 N.J.Super. at 144-45, 534 A.2d 41; Pagano v. Zoning Bd. of Adjustment, 257 N.J.Super. 382, 395-98, 608 A.2d 469 (Law Div.1992). This is the proper standard for review despite the statutory power granted to the Board to interpret its zoning ordinance. Cherney, supra, 221 N.J.Super. at 145, 534 A.2d 41.[4]
A number of rules apply to the interpretation of a zoning ordinance. Such ordinances are to be given a reasonable construction and are to be liberally construed in favor of the municipality. Terner v. Spyco, Inc., 226 N.J.Super. 532, 539, 545 A.2d 192 (App.Div.1988). The legislative intent is to be derived from the language used. Id. These and similar rules governing construction will come into play as the court determines the central issue presented in this appeal.

THE INTERPRETATION OF THE ORDINANCE
Defendant Lucchese proposed to construct a "domestic animal shelter" with approximate dimensions of twelve feet by forty feet (12' X 40'), or an area of 480 square feet. The structure would be located in the rear yard of property with a lot area of approximately 88,000 square feet, or two (2) acres, similar to other residential lots in the subdivision.
The structure would comply with the setback requirements of the AG (Agricultural) District, wherein the property is located, and would house forty to fifty racing pigeons. The structure would be subject to cleansing twice a day, and would be climate controlled. The pigeons themselves would be released from the structure twice a day for a period not to exceed two (2) hours during only the warmer months in all seasons except winter.
The defendant represented that he raises, trains and breeds racing pigeons only as a hobby. The pigeons would not be used for business or commercial purposes, and would not be sold, bred, shown or raced for profit. Furthermore, the proposed structure would not be used to house pigeons from third parties for boarding or breeding purposes. Thus, defendant Zoning Board of Adjustment concluded in its interpretation resolution that "the proposed use is exclusively that of a self-contained hobby for the property owner."
Ultimately, defendant Board concluded that while the raising of racing pigeons does not serve agricultural purposes in this agriculturally sensitive zoning district, the proposed use is "subordinate" and "incidental" as an accessory use to the permitted primary residential use. The defendant Board reasoned that the raising of racing pigeons "while perhaps not a widely popular hobby, is nevertheless a hobby which is incidental to the residential use of the property in question and is the type of hobby which would customarily be associated with a residential use."[5]
As indicated, the subject property is located in the AG (Agricultural) District. Under Section 707.2B of the Township's Land Use Ordinance, the permitted principal uses include *461 agricultural purposes buildings, including farm laborer shelters, farms and residences. The Ordinance does not specifically list "domestic animal shelters" as a permitted accessory use.
Moreover, Section 301 of the Ordinance defines "accessory building[s], structure or use" as one "which is customarily associated with, and is subordinate and incidental to, the principal building, structure, or use and which is located on the same lot therewith, whether the same be attached or detached." Finally, Section 418 provides that "[a]ll uses not expressly permitted in this ordinance are prohibited."
The allowance of a primary use generally authorizes all uses normally accessory, auxiliary, or incidental thereto, but while uses accessory to a dwelling function should not be unduly restricted, such uses are not without limitation, which is reached when the use impairs the residential character of the neighborhood. Borough of Northvale v. Blundo, 81 N.J.Super. 201, 195 A.2d 221 (Law Div.1963) (parking of commercial vehicles outside garage was not an accessory use to dwelling function of property).
However, as the Appellate Division concluded in Borough of Chatham v. Donaldson, 69 N.J.Super. 277 at 282, 174 A.2d 213 (App. Div.1961):
Use by a family of a home under our customs includes more than simple use of a house and grounds for food and shelter. It also includes its use for private religious, educational, cultural and recreational advantages of the family. [citation omitted]. Pursuit of a hobby is clearly customarily a part of recreational activities. As long as the pursuit thereof is not of such a nature, or to such an extent, as to impair the residential character of the neighborhood, it cannot be supposed a zoning ordinance was intended to prevent it.

[Id. at 282, 174 A.2d 213]
Various judicial rules have been developed as to accessory uses. Accessory uses are impliedly permitted, even where they are not expressly described or allowed in the zoning ordinance, and the use of one's land cannot be a nuisance per se. Boublis et al v. Garden State Farms, Inc., et al, 122 N.J.Super. 208, 216-17, 299 A.2d 763 (Law Div.1972) (heliport is incidental to corporate property use.) The usual rule, however, has been that a use that is not expressly provided for is prohibited. Sun Company, Inc. v. Zoning Bd. of Adjustment of Bor. of Avalon, 286 N.J.Super. 440, 669 A.2d 833 (App.Div. 1996). For an accessory use to be customarily associated with a primary use, it must be closely examined to determine whether it has commonly, habitually and by long practice been established as reasonably associated with the primary use. Shim v. Washington Tp. Planning Bd., 298 N.J.Super. 395, 404, 689 A.2d 804 (App.Div.1997), citing Charlie Brown of Chatham, Inc., v. Bd. of Adjustment, 202 N.J.Super. 312, 324, 495 A.2d 119 (App.Div.1985).
Finally, we have Tanis v. Tp. of Hampton, supra. As in the present matter, the Tanis court was faced with a zoning ordinance that neither expressly permitted nor expressly prohibited the specific proposed accessory use and included a restrictive clause generally prohibiting all uses not expressly permitted. However, as the court noted, the inquiry does not end at that point, because "of the implied nature of accessory uses and the impracticality of defining in advance every permissible accessory use." Id. at 601, 704 A.2d 62. (emphasis added). Simply stated, "accessory use" is an evolving concept.
In Borough of Chatham v. Donaldson, supra, the court concluded that the parking of four automobiles in a driveway, not for commercial purposes or for profit, was accessory to a residential use in an area when "[t]wo-and three-car families are commonplace." Id. at 282, 174 A.2d 213. The court would also note that this was in 1961. In Township of Livingston v. Marchev, 85 N.J.Super. 428, 205 A.2d 65 (App.Div.1964), the parking of a "small unoccupied [vacation] trailer outdoors alongside their home" was held not an accessory use in a residential district. However, today, the prevalence of recreational vehicles, minivans, and "SUV" 's as family use vehicles would likely change the outcome of that case.
In Shim v. Washington Township Planning Board, supra, the issue was whether a day care center was an accessory use to the *462 primary use of a church. In concluding that the daycare center was "customarily incidental" to the church's principal use, the Appellate Division stated that "[w]hat is clear from this modern trend is that a church's ministry is not confined to prayer or dissemination of its religion's beliefs." Id. at 408, 689 A.2d 804. Moreover, the Shim court suggested that the emphasis should be "on the actual problems posed by a particular activity, rather than categorically prohibiting uses because they are not `normal.'" Id. at 410, 689 A.2d 804.
Indeed, the court in Tanis made significant comment on this issue, citing Jantausch v. Borough of Verona, 41 N.J.Super. 89, 100, 124 A.2d 14, aff'd 24 N.J. 326, 131 A.2d 881 (1957):
... The practice [as to the accessory use] should be sufficient to justify the observation that is not unique or rare. It should be appreciable or perhaps substantial. It should be sufficient to constitute a recognized mode of activity ... but it need not be the most prevalent one.

[Id. at 604, 704 A.2d 62.[6]]
The issue before the Tanis court, as well as this court, is how to address this ever-evolving concept of accessory uses, while maintaining, for the neighborhood's residential use, "the preservation of family-style living, the blessing of quiet seclusion, and the refreshment of repose and tranquility of solitude [as] legitimate zoning goals." State v. Miller, 83 N.J. 402, 410, 416 A.2d 821 (1980). Indeed, "[t]he law is not difficult to recite but difficult to apply." Charlie Brown of Chatham, Inc. v. Bd. of Adjustment, supra, 202 N.J.Super. at 323, 495 A.2d 119. Tanis presents a two-pronged test to resolve the issue as to appropriate incidental, customary uses: commonality and impact. It balances the dynamics of change against the avoidance of detriment in a zoning context.
As to the first prong, commonality, a court must "determine whether [the proposed use] has commonly, habitually and by long practice been established as reasonably associated with the primary use." Charlie Brown, supra, at 324, 495 A.2d 119. This is to say that a proposed accessory use must not be "peculiar to the applicant," but rather one "prevailing generally."[7]
To apply the "prevailing generally" standard, the court must first identify some point of reference. Clearly, as perhaps the only "domestic animal shelter" proposed or existing in Colts Neck Township, that geographical measurement would require the obvious conclusion that the proposed use is not one "prevailing generally."
Yet, as the Supreme Court concluded in State v. P.T. & L. Const. Co., Inc., 77 N.J. 20, 27, 389 A.2d 448 (1978), "even if the use in question is found in a small percentage of similar main uses, the use may still be found to be `customary.'" This suggests, if not mandates, as earlier discussed, a broader point of geographical reference. It also recognizes the evolving nature of implicit incidental *463 uses of property, where the reality of modern living may outstrip the literal language of the zoning ordinance.
As the Tanis court inferentially concluded, "the operative fact is not how often the primary use requires or involves the alleged accessory use, but whether incidents of the accessory uses are often found in conjunction with this particular primary use." Id. at 604, 704 A.2d 62. Is the proposed use "unique or rare" or "sufficient to constitute a recognized mode of activity"? Jantausch v. Bor. of Verona, supra, 41 N.J.Super. at 100, 124 A.2d 14.
With regard to the instant matter, it was established by the credible testimony presented before the defendant Zoning Board of Adjustment that there is, indeed, a long-time hobby of raising racing pigeons, or homing pigeons, that it is a wide-ranging hobby with special interest clubs scattered across New Jersey, the country and the world, and that enthusiasts often pursue their hobby by keeping coops on their residential property. Indeed, in Middletown Township, a municipality adjacent to Colts Neck, there exists such a club. The Central Jersey Homing Pigeon Combine, with more than 1,000 members, is even allowed, apparently, to use public facilities for club activities.
Nothing has been presented to the court to refute the conclusion that the proposed use is a "recognized mode of activity" incidental, as a recreational use or hobby, to a primary residential use. It may not be common in Colts Neck, but is irrefutably a recognized activity, which has apparently been pursued popularly and widely for some time.[8]
Therefore, the court has concluded that in the context of the relevant case law and facts demonstrated, the proposed use is a hobby long established as reasonably associated with a residential use. It may be unique or singular in the Township of Colts Neck, New Jersey, but is not so unusual in a state where there has developed a variety of animal-related hobbies. Moreover, this is not a hobby that has evolved from the maintenance of a single pigeon. Yet, it may be as unusual for these plaintiffs as the construction of an amateur radio tower was in a residential neighborhood in 1963 for the plaintiffs in Skinner v. Zoning Board of Adjustment of Cherry Hill, 80 N.J.Super. 380, 193 A.2d 861 (App.Div.1963).
It is the second prong outlined by the Tanis courti.e., impactthat has been most extensively argued by the plaintiffs, even if the issue was specifically ignored by the defendant Board in its decision. It "focuses on the impact of the [proposed] use on the surrounding neighborhood and the zoning plan." Id. at 606, 704 A.2d 62.
Plaintiffs center their argument on possible health concerns, and incidentally aesthetic and property value impact concerns. As to such a matter, such concerns are not uncommon and, in human terms at least, are understandable. However, the determinative question is whether these concerns constitute a legal impact.[9] *464 As to the issue of aesthetics, such a concern can be a relevant consideration in making a zoning decision. United Advertising Corp. v. Bor. of Metuchen, 42 N.J. 1, 198 A.2d 447 (1964). However, aesthetic concerns cannot be addressed in an arbitrary, imprecise, or ad hoc manner. Aesthetics must be regulated by proper standards "with reasonable precision and without blanket delegation." Damurjian v. Bd. of Adjustment of Tp. of Colts Neck, 299 N.J.Super. 84, 97, 690 A.2d 655 (App.Div.1997). Where reasonable standards are provided, the promotion of aesthetic considerations through such regulations will be sustained. Zilinsky v. Zoning Bd. of Adj. of Verona, 105 N.J. 363, 368-69, 521 A.2d 841 (1987). No aesthetic regulations of the Township of Colts Neck have been presented for consideration which specifically involve the issue before the court.
Moreover, neighborhood aesthetics can be significantly related to property values, and are relevant considerations to zoning when they bear in a substantial way upon land utilization. Vickers v. Tp. Committee of Gloucester Tp., 37 N.J. 232, 247-48, 181 A.2d 129 (1962). However, again, no specific evidence has been presented to objectively demonstrate an actual impact upon neighborhood property values resulting from the proposed use.
Aesthetic considerations clearly contemplate the degree to which a proposed use of *465 land creates a nuisance. However, as already stated, no use of land creates a nuisance per se. Boublis v. Garden State Farms, Inc., supra.[10]
Plaintiffs focus most of their argument on their alleged concern for possible health hazards arising from the keeping of the racing pigeons. Their concerns for the health of their families and themselves is understandable, and, the court concludes, sincere. These concerns largely reflect the unknown nature of the consequences in the keeping of racing pigeons, and the plaintiffs' lack of certainty about it. However, as Justice Oliver Wendell Holmes stated, "[c]ertainty, generally, is illusion, and repose is not the destiny of man." Holmes, The Path of the Law (1897).
What we can only expect are reasonable possibilities predicated not upon speculation, but rather upon objective data and standards. Nothing has been presented to the court, or for that matter the defendant Board in the earlier proceedings, which would move the issue beyond speculation. No credible medical or health testimony gave objective proof to even these sincere concerns.[11]
*466 In conclusion, the court finds that under the two-pronged standard of Tanis v. Township of Hampton, supra, and under the then-existing zoning ordinance, defendant Lucchese may maintain a "domestic animal shelter" as a hobby and accessory use on his residential property, subject to all his representations to the defendant Zoning Board of Adjustment. The Board's interpretation permitting this use is affirmed for the reasons stated herein.[12]
NOTES
[1] In his third-party complaint, this defendant asserted certain claims as to several Township officials, who reportedly advised him that he could undertake the maintenance of the pigeons on the property in question, and in reliance upon these representations, he entered into his purchase contract.

This issue as to estoppel is not the subject of this decision. Moreover, the subsequent opinion and decision to require the defendant to apply to the defendant Zoning Board of Adjustment are relevant only as to the procedural process by which this appeal arose.
[2] Defendant Lucchese's third-party complaint challenges the validity of Ordinance 1997-10, at least as applied to him and his property. This issue was bifurcated pursuant to the court's order of November 20, 1997. If the decision of the defendant Zoning Board of Adjustment as to the interpretation is affirmed, this issue will have to be addressed in the context of the "time of decision" rule. Burcam Corp. v. Planning Bd. Tp. of Medford, 168 N.J.Super. 508, 512, 403 A.2d 921 (App.Div.1979); Allocco & Luccarelli v. Holmdel, 299 N.J.Super. 491, 691 A.2d 430 (Law Div. 1997).
[3] It must be noted that since the interpretation of a zoning ordinance is a legal issue, related to a judicial function, a party may seek a court's determination without first applying to the board. See, Supermarkets Oil v. Zollinger, 126 N.J.Super. 505, 315 A.2d 702 (App.Div.1974); Pullen v. So. Plainfield Planning Bd., 291 N.J.Super. 303, 308-10, 677 A.2d 278 (Law Div.1995) aff'd on other grounds, 291 N.J.Super. 1, 676 A.2d 1095 (App.Div.1996). However, see 21st Century v. D'Alessandro, 257 N.J.Super. 320, 323, 608 A.2d 438 (App.Div.1992).
[4] While the parties agree that this issue can be decided by the court without the need for a remand, the de novo standard to be applied in this review cures such alleged earlier hearing defects as the admission of unsworn statements and inadmissible third-party letters. See, Tanis v. Tp. of Hampton, 306 N.J.Super. 588, 597, 704 A.2d 62 (App.Div.1997). As to the admission of evidence at the earlier administrative hearing, see, N.J.S.A. 40:55D-10e.
[5] Other than to acknowledge various objectors' concerns as to "potential health issues, visual aesthetics of the proposed structure and potential adverse impact upon property values," the defendant Board concluded "these issues are not material to the Board's consideration on this application and thus, are not addressed in this resolution." Clearly, in its decision, the Board focused only upon the claimed hobby and its possible customary association with the primary residential use.
[6] Finally, as Professor Cox has noted, "[a]s to the keeping of animals, from time immemorial the usual household pets have been recognized as `customary' in residential districts. More recently, however, the list of animals kept has expanded beyond cats, dogs, canaries and goldfish to include such creatures as exotic birds, various kinds of reptiles, pumas, ponies and pygmy pigs and goats." Cox, New Jersey Zoning and Land Use Administration (1998 Edition), Section 10-2, at page 204.

At oral argument, plaintiffs argued that the term "animal" should be defined in the most generic sense, and that the maintenance of more than a single animal on an individual's property might constitute farming. However, the court is not satisfied that the objective number of animalshere pigeonsmakes their presence not a hobby, but a farming situation per se. Just as a flock of forty small birds does not amount to a farming event, neither does a litter of ten kittens, a cage full of thirty gerbels, or an indoor "farm" of 2,000 ants. Moreover, the issue is not what constitutes a "household pet," but rather, what parameters should exist as to a possible animal-related hobby being conducted on residential property.
[7] The court in Charlie Brown of Chatham, besides concluding that the use must be "customarily" associated with such a primary use, initially required a finding as to the "incidental" nature of the use, that it is "subordinate" and "minor in significance" in relation to the subject property. Charlie Brown of Chatham, supra, at 324, 495 A.2d 119. There is no reasonable dispute that the proposed "domestic animal shelter" is "subordinate" and "minor in significance" to the specific residential use of the subject property in this matter.
[8] As an exhibit to the hearing below and pursuant to R. 1:36-3, the court and all parties have been provided with a copy of the unpublished opinion of Township of ParsippanyTroy Hills v. Frank Perillo, Morris County Court, Law Division, Appeal No. 57-62 (1964). While this opinion is obviously not controlling, it is noted that nearly thirty-five years ago it was recognized that the raising of racing pigeons existed as an incidental hobby to a residential use, again, largely in a suburban/rural area.
[9] Although best reserved for consideration of the amendatory ordinance issue, a number of cases have addressed the regulation of pigeons. The idea that pigeons are a "nuisance per se" has long been rejected. Barkmann v. Town of Hempstead, 45 N.Y.S.2d 675, 676 (Nassau Cnty.1944). That case went on to invalidate a city ordinance which prohibited the housing of pigeons, where the petitioner sought to raise them in a private loft at least 130 feet from the nearest neighbor.

In People v. Miller, 304 N.Y. 105, 106 N.E.2d 34 (1952), the court refused to interfere with or reinterpret an ordinance which banned the housing of certain animals, including pigeons, where only a recreational interest, and no pecuniary concern, of the petitioner was affected. Id. at 109, 106 N.E.2d 34. As a mere hobby, the keeping of pigeons was found not to be a vested right.
A victory for pigeon enthusiasts came in 1958, when a trial court in Ohio found that in the absence of excessive noise, odor, infestation or other problem, the keeping of pigeons could not reasonably be prohibited by ordinance. Hahn v. City of Brooklyn, 153 N.E.2d 359, 367-68 (Ohio Com.Pl.1958). Although the case at bar does not (at this time) seek a determination as to the reasonableness of the ordinance, the Hahn court's determination is similar to a weighing of the mandatory factors under the Municipal Land Use Law and the Tanis decision.
New Jersey first visited the issue in Hourun v. Township Committee of Union, 99 N.J.Super. 58, 238 A.2d 501 (App.Div.), certif. den., 51 N.J. 576, 242 A.2d 380 (1968). Therein, a resident challenged a municipal ordinance which expressly excluded the keeping of pigeons from lawful accessory uses of his residential property. The residence in question was in a higher-income area of the municipality.
After the trial court found that the pigeons did not pose a threat to the public's safety, health, or well-being, the Appellate Division reversed, holding that in the absence of clear proofs adduced one way or the other, they were bound by the presumption of validity given to municipal ordinances. Id. at 63-64, 238 A.2d 501. The court again notes, however, that no such presumption of validity is required or given in this instance, as this case presently deals with the interpretation of the municipal ordinance, not the enforcement or propriety of an ordinance.
In People v. Benincasa, 63 Misc.2d 648, 313 N.Y.S.2d 211 (Nassau Cnty.1970), the ordinance excluded the raising of pigeons on residential property, but premised this exclusion upon the fact that the defendant was conducting a for-profit business with the pigeons, and not using them as a recreational hobby, as is the defendant in the instant case. Id. 313 N.Y.S.2d at 215.
More recently, the Appellate Division in New York affirmed the overturning of a zoning board's interpretation of a zoning plan to exclude the raising of pigeons. Marcello v. Humenik, 222 A.D.2d 677, 635 N.Y.S.2d 676 (1995). That court found that the board's denial of a variance application was based upon summary statements from neighbors of the applicant, who were friendly with the board members. As such, the credible weighing of the positive and negative factors evaluating the interpretation were not valid, and were properly overturned upon the court's de novo review. Id. at 677, 635 N.Y.S.2d 676.
Finally, there is Guidi v. City of Atlantic City, 286 N.J.Super. 243, 668 A.2d 1098 (App.Div. 1996). Therein, the Appellate Division held that an ordinance which prohibited "any matter, thing, condition or act which is or may become an annoyance, or interfere with the comfort or general well-being of the inhabitants of this municipality," was vague and overbroad, particularly when the plaintiff was charged with the feeding of pigeons.
In stating that, as a secondary matter, "[p]igeons are a common enough problem for a municipality to address," Id. at 246, 668 A.2d 1098, the court cited three (3) decisions in support of its conclusion that a specific ordinance could be drafted to regulate the feeding of common pigeons. Id.
In City of Des Plaines v. Gacs, 65 Ill.App.3d 44, 22 Ill.Dec. 82, 382 N.E.2d 402 (1978) an Illinois appellate court concluded "[a]t best the evidence with respect to whether racing pigeons are disease carriers and a significant health hazard to the community presents only a debatable question over which there is room for honest differences of opinion." Id. 22 Ill.Dec. 82, 382 N.E.2d at 406. See Hourun, supra.
In Hayward v. Samuel, et al, 354 Pa. 266, 47 A.2d 251 (1946), the Pennsylvania Supreme Court upheld an ordinance that permitted the killing of pigeons, other than carrier pigeons, for the protection of public health. Lastly, in People v. Benincasa, supra, the trial court made no findings as to the health aspects related to pigeons, since the court found that the "keeping of pigeons" under the facts presented in that case was a business.
In summary, it is difficult to conclude that health issues related to the raising of pigeons have been resolved and that the issue is settled as a matter of law at this time. Addressing Township Ordinance 1997-10 may allow that conclusion.
[10] It must also be noted that until the adoption of Township Ordinance 1997-10, while no ordinance permitted the raising of carrier or racing pigeons as a residential hobby, no ordinance prevented such an activity. Indeed, the mixed farming/residential nature of the zoning district in which the subject property is located argues for an animal-friendly environment.

Furthermore, while the proposed activity will not be conducted on a lot of ten acres or more, neither will it take place on an average urban lot of fifty by one hundred feet (50' × 100'), with dense population. It would be conducted in the back yard of a lot covering approximately two acres, and not on a housing unit porch, balcony or rooftop. Defendant Lucchese will have to observe all applicable laws and is bound by his own representations before the defendant Board.
Nor is there an issue of two principal uses being conducted on the same property. Sun Company, Inc. v. Zoning Bd. of Adjustment of Borough of Avalon, 286 N.J.Super. 440, 669 A.2d 833 (App.Div.1996) The then-existing zoning ordinance did not prohibit the raising of pigeons. Nor does it limit the number of animals which may be kept on a residential property in conjunction with a hobby.
Plaintiffs correctly indicate that the interpretive process requires a review of the entire zoning ordinance to give affect to all relevant provisions in determining the overriding intent. However, that does not mean misapplying ordinance provisions, presumptively valid but not relevant to the existing issues, e.g., the application of bulk requirements of the A-1 zoning district to determine what are permitted principal and/or accessory uses of the AG zone. Nor does it mean ignoring the actual language for permitted principal and accessory uses for the AG zone. Finally, in determining the legislative intent, one is not permitted to overlook the fact that the AG zone is not designed as a pristine, self-contained residential zoning district, but is, rather, a mixed-use district where residential use is allowed or tolerated, perhaps grudgingly, as a practical compromise, in order to attempt to preserve the pre-existing rural or agricultural nature deemed desirable in the face of development pressures. At best, under the specific zoning scheme for this zoning district, residential uses, if not deemed secondary, must coexist with uses that are animal-friendly, with their attendant potential concerns as to health and aesthetics. Indeed, both the ordinance and master plan update speak in terms of the desire and need to preserve the overriding agricultural nature of this district which use has predated the residential development of recent years.
[11] Defendant Lucchese is bound by his representations. Any deviation would not only nullify the affirmative interpretation he received, but must result in an appropriate enforcement action by local health and code enforcement authorities. The experts' conclusion, as a veterinarian and health officer, that there will be no problems in this mixed farm/residential zoning district in an encroached upon yet rural/suburban setting, if there is proper maintenance of both the structure and the animals within, has a certain clarity of logic. At that point, there might be a need for vigilant enforcement to prevent or remove a nuisance. "A nuisance may merely be a right thing in a wrong place [or condition], like a pig in a parlor instead of the backyard." Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 386, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926).

It appears to the court that one of the most influential factors in the Board's determination was from the site visit conducted by several members of the Board to Mr. Lucchese's Staten Island home. Several of these members stated on the record that at first they were opposed to the idea of allowing a loft for close to fifty (50) homing pigeons located so close to a residential area. After the visit, they had changed their minds and were very supportive due to the conditions they saw at the existing loft.
It is well established that board members may rely upon their own observations, so long as these observations are placed upon the record. Baghdikian v. Bd. of Adjustment of Borough of Ramsey, 247 N.J.Super. 45, 51, 588 A.2d 846 (App.Div.1991) ("site inspection by zoning boards has been expressly approved by our Supreme Court as an invaluable technique in acquiring `first hand knowledge ... in the determination of zoning cases.'") (quoting Giordano v. City Comm'n of City of Newark, 2 N.J. 585, 589, 67 A.2d 454 (1949)). Thus, the court finds no reason to overturn the Board's determination based upon the evidence submitted to the Board by Mr. Lucchese.
The Chairwoman, who visited the site, agreed that the raising of pigeons was not what she first envisioned, but she was concerned that the raising of pigeons would be in a residential area, rather than on a farm. She expressed her opinion, to which several other members agreed (it is not certain if these other members of the Board went to visit the site in Staten Island). The Board had before it both sides of the issue and made its vote. That vote found in favor of Mr. Lucchese's application.
Although the court, as discussed, does not give a presumption of validity to the vote of the Board, the informed decision of that body is worth mentioning. Community education can be helpful in understanding the evolving accessory uses of property.
[12] This does not conclude this litigation. As indicated, the earlier trial court judge bifurcated the issue as to the subsequent impact of Township Ordinance 1997-10 on this earlier interpretation by the defendant Zoning Board of Adjustment. By necessity, the court's decision on the interpretation, therefore, could not take into consideration this possibly intervening ordinance, and was limited to the facts and law that existed prior to May 14, 1997, the date on which the ordinance was finally adopted.

Further proceedings would require consideration of the possible applicability of the ordinance under the "time of decision" rule, its substantive validity, if applicable, and, if valid, whether equitable considerations would still exempt the proposed use from its affects.
Since the action challenging the validity of the intervening ordinance that has been bifurcated was brought by defendant Lucchese, whose favorable interpretation as to the proposed accessory use of his property has been upheld, a question can be raised as to what is his, or anyone's, interest or utility in continuing this litigation?
There is the question as to whether the favorable interpretation, alone, vested defendant Lucchese with immutable rights when further approvals were still pending. Plaintiffs' nuisance claims also remain, in some form.
Clearly, a dismissal of the third-party complaint at this time can only be by "leave of court." R. 4:37-1(b), even if plaintiffs' nuisance claims were not plead. Beyond the interpretation issue, however, the defendant has asserted monetary claims, particularly because of the delay in implementing the desired use. Moreover, a dismissal pursuant to R. 4:37-1(b) is normally without prejudice.
However, even assuming the dismissal, by agreement or otherwise, was with prejudice (and see Mack Auto Imports v. Jaguar Cars, 244 N.J.Super. 254, 581 A.2d 1372 (App.Div.1990) as to the standards governing the determination of whether a dismissal is to be with or without prejudice), there is a significant public policy issue concerning the impact of this ordinance on the proposed use that requires that the litigation continue.
Even when issues presented are technically moot, a court may nonetheless address them when they involve a particular public interest. Kuehne Chem. v. North Jersey Wtr. Com'n, 300 N.J.Super. 433, 443, 693 A.2d 168 (App.Div.), certif. den., 151 N.J. 466, 700 A.2d 878 (1997). State courts are not restricted to the narrow confines of the case or controversy doctrine of the federal courts, In re New Jersey Bd. of Public Util., 200 N.J.Super. 544, 555, 491 A.2d 1295 (App.Div.1985); Dome Realty, Inc. v. Paterson, 150 N.J.Super. 448, 452, 375 A.2d 1240 (App.Div. 1977), and may decide arguably moot points where equity and public concerns so dictate. Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 94, 415 A.2d 1156 (1980). Therefore, where, as here, a case is of significant public importance or is likely to recur, adjudication of the issue, even when it may be moot in the instant case, is warranted. State v. Gartland, 149 N.J. 456, 464, 694 A.2d 564 (1997); In re Geraghty, 68 N.J. 209, 212-13, 343 A.2d 737 (1975).
The ordinance's impact and its relation to a possible nuisance necessitates this conclusion, since the public interest requires, among other reasons, the fuller opportunity to address the potential health and related issues considered in a more limited fashion before the defendant Board. Certainly, the defendant Board's actions should not deprive its creator governing body of its "day in court," for a legislative issue that goes beyond a single "domestic animal shelter" administratively approved.