254 N.J. Super. 28 (1992)
603 A.2d 53
EDWARD J. WYZYKOWSKI, GALE WYZYKOWSKI AND JACQUELINE CATLEY, PLAINTIFFS-APPELLANTS, CROSS-RESPONDENTS,
v.
ROBERT E. RIZAS AND THE PLANNING BOARD OF THE TOWNSHIP OF NEPTUNE, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1991.
Decided February 3, 1992.
*30 Before Judges KING, DREIER and BROCHIN.
William H. Oliver, Jr., argued the cause for appellants.
Arnold B. Levin argued the cause for respondent Rizas (Levin & Spector, attorneys).
Thomas J. Smith, III, argued the cause for respondent, Neptune Township (Smith, Shaw, Smith & Oxley, attorneys).
The opinion of the court was delivered by KING, P.J.A.D.
This appeal involves an application to the Neptune Planning Board concerning development of a vacant property in the Historic District-Commercial (HDC) of Ocean Grove, now a part of Neptune Township. The applicant developer, defendant Robert E. Rizas, was the Mayor of the Township during calendar years 1988 and 1989. The application for site plan approval and a bulk variance for a combination office and apartment building was approved by the Planning Board by a 3-2 vote (out of nine regular members) over strong public opposition in August 1989. In the prerogative writ challenge, Judge Selikoff, on August 3, 1990, reversed the decision in part and remanded to the Planning Board to conduct a new application process. He concluded that the Board's decision was tainted by the Mayor's participation in the application process in these particular circumstances. On this appeal by the objectors and cross-appeal by the developer-Mayor, we essentially affirm the result reached in the Law Division with some modification of the opinion and order.
This 94' X 65' Lawrence Avenue lot is the only undeveloped property in this particular zone and one of the very few *31 undeveloped properties in Ocean Grove. The Mayor was a member of the Planning Board at the time of the application. When the application was filed on March 9, 1989 the Mayor was described in it as the "contract purchaser." We were informed at oral argument that he had bought the undeveloped property from the water company during his 1988-1989 term of office as Mayor. He later closed on the property, finally and without condition, during the pendency of the application process. The Mayor testified at the hearing that he was engaged in the business of commercial development, ownership of properties, and rental management. The application to the Planning Board was granted by formal resolution on August 23, 1989 and was immediately challenged in the Law Division. The applicant-Mayor's term of office meanwhile expired on December 31, 1989.
On March 7, 1989 the Mayor filed the original application for site plan approval of this proposed three-story building, described as a ground floor office and eleven second and third floor apartments. He also applied for a bulk variance from a loading-space requirement. As noted, the property was located in the Historic-District Commercial zone (HDC).
The Mayor was a Class I member of the nine-member (plus two alternates) Planning Board during 1988 and 1989. N.J.S.A. 40:55D-23(a). Other members of the Board included an official of the municipality appointed by the Mayor, Class II; a member of the governing body appointed by it, Class III; and other citizens of the municipality, non-office holders, appointed by the Mayor, Class IV. Ibid. The terms of office vary. N.J.S.A. 40:55D-23(b). Members are disqualified by statute in matters where they have a direct or indirect personal or financial interest. Ibid.
The Township of Neptune's governing body is a five-member Township Committee. The public votes for and elects the members of the Committee at large. The Committee selects the Mayor from among its five members. The Class II Planning *32 Board member, who must be an official of the municipality, was Gene Marks, Sr., who was appointed by Mayor Rizas. Marks participated and voted in favor of the decision. Marks also was the building inspector, construction official and code enforcement supervisor (total salary $37,500). His appointment resolution for these three positions adopted on September 26, 1988 was moved by Mayor Rizas and approved by a 3-2 vote of the Committee. His qualification to participate was challenged. The Class III member, Daryl Daniels, also a member of the governing body, disqualified himself. As to the six Class IV members, Mayor Rizas had appointed Erman K. Jones, the Chair who voted in favor of the application and Paul J. Roberts, who disqualified himself. The remaining Class IV appointments, holdovers from prior administrations, were: David Mooj, Carl E. Ulmer, Peter Stagg and Robert Kibbler. Mooj, Ulmer and Kibbler did not participate in the decision because they had not attended all of the meetings; Stagg voted against the application. The two alternates, Joe Sears and George Basket, see N.J.S.A. 40:55D-23.1, were appointed by Mayor Rizas; Sears voted against and Basket in favor of the application.
As to the relevant professional appointments, they were made by the entire Planning Board, not solely by the Mayor. N.J.S.A. 40:55D-24. The Planning Board engineer disqualified himself. The engineer who participated and advised the Board had served in a prior administration and was not appointed by the Mayor. The Planning Board's planner apparently had been in office for a lengthy period but had been reappointed during 1989. The Mayor himself had moved the resolution appointing the Solicitor for the Planning Board, Mr. Smith. Throughout the proceedings, timely objections were made by counsel for the objectors and the public to the Mayor's application because he was the developer and to the participation of various members and staff.
The hearings on the application began on March 22, 1989. Two basic substantive objections were lodged against the application. The first objection was directed at the Planning *33 Board's jurisdiction. The objectors argued that the HDC zone required a commercial use as the "principal" use of the building. The relevant ordinance, Article XXI Regulation, Sec. 3.1 includes "professional and business offices" as a "principal use." Apartments in "mixed use commercial residential structures" are allowed in the zone as an "accessory use." Accessory uses are defined in the Zoning Ordinance Section 10.1(B)(2) as "a use customarily incidental and subordinate to the main use conducted on a lot, whether the accessory use be conducted in the main or accessory building." The objectors contended that because the proposed building had a ratio of eleven apartments to one office, the "principal" use was residential and therefore not in compliance. The objectors urged that the application required a "use" variance and should first go before the Board of Adjustment. The objectors also argued that the proposed building created severe density, parking and traffic problems. They felt that the defendant should provide some off-street parking as the property fronted on a narrow street. The ordinance did not have any off-street parking requirements for this situation.
Mayor Rizas' attorney argued that the apartments were a permitted use, fitting within the zoning ordinance's language. He stressed that the ordinance did not define what percentage of the building must be a "principal use" to comply and that there was no indication that "accessory," as defined by the ordinance, meant "related to or incidental to the principal use." After much discussion, the Planning Board continued the matter to May 24, 1989.
On May 15, 1989 Rizas allegedly filed a revision to the site plan application, increasing the commercial use by proposing three offices with only six "upstairs" apartments. Additionally, six off-street parking spaces were created, although this decreased on-street parking spaces by three because of the driveways for the off-street spaces. There was a dispute concerning whether these revisions were actually filed on May 17, 1989 and backdated to May 15.
*34 The objectors then filed an action in lieu of prerogative writ on May 22, 1989 seeking an injunction to prevent the Planning Board from considering the application. The basis for relief included the alleged lack of subject matter jurisdiction. The objectors also alleged a procedural deficiency, claiming that the revised plans had been substantially changed and that N.J.S.A. 40:55D-10(b) applied, requiring filing the plans at least ten days prior to the Board's meeting. Judge Selikoff denied the requested injunctive relief on May 23, 1989 and the matter proceeded before the Planning Board.
On May 24, 1989, the testimony of Mayor Rizas' architect and professional planner was heard. These expert witnesses said that the application met all the zoning requirements with the exception of the loading zone. The hearings were continued again to July 26, 1989.
The Board then decided to move the date of the hearings back to July 12, 1989. Mayor Rizas claims that he sent notices to the property owners within 200 feet and that notices were published in the newspaper. The objectors raised the claim at that meeting that proper notice had not been given. The Planning Board then decided to continue the hearings to July 26, 1989 to allow those members of the public not present an opportunity to be heard. At that July 12 meeting Mayor Rizas introduced exhibits of various existing buildings in the HDC zone. Many of these buildings included commercial uses mixed with apartments.
The municipal planner testified at the July 26, 1989 hearing. He was of the opinion that the proposal met the zoning requirements and qualified as a "mixed-use" structure. The objectors offered expert and lay evidence that the proposed parking was inadequate, the use of the site was too intense, and the proposal for six apartments over three offices was not an accessory use within the meaning of the ordinance, among other objections. Also, the Township's Board of Architectural Review had recommended a denial of the application. The Planning Board then *35 voted and approved the application by a vote of 3-2. The approval was memorialized in a written resolution on August 23, 1989.
In his decision in the prerogative writ action, Judge Selikoff concluded that the Planning Board did have jurisdiction and that a use variance was not needed. Nonetheless, he remanded to the Planning Board because of the appearance of a conflict of interest throughout the process. He recited his concerns this way:
Now, very importantly, the plaintiff had raised the question of conflict of interest and perception of impropriety and here the court has had a greater deal of input. It seems unfair to prevent a member of a governing body of any municipality or entity to be confronted with charges of conflict or impropriety in a desire to develop some land which he may own within the municipality.
But despite that, there are problems. Mr. Rizas, at the time of the application, was mayor of the Township of Neptune. He applied to the planning board, which he had the right to do, in order to develop his particular piece of property, but the planning board was composed of those appointed by him to hear the application and to submit recommendations concerning the application.
In his capacity as mayor, he made appointments to the planning board pursuant to the provisions of N.J.S.A. 40:55D-23. As a mayor, he was a member of the planning board and he also appointed, with the advice and consent of the township committee, the township attorney, township engineer and municipal planner.
Here there was a relationship between the appointing authority as the applicant and those who were called upon to decide the application. The plaintiff argues that this creates an aura of conflict that cannot be ignored.
* * * * * * * *
However, they all, all meaning all the cases, are very much concerned with that perception of impropriety and the problem is not one of actual conflict, the problem is the public perception of influence.
* * * * * * * *
Now, again, there is no suggestion here that Mr. Rizas, as mayor, made a determined effort to influence the vote on this particular case but the fact is that he was the mayor, he was the applicant, he was an appointing authority. He was a member of the board. And as presented to this court, although he did disqualify himself, he was the applicant. It was known that he was the applicant and after this matter was disposed of, he resumed his seat on the Board.
And therefore, the question is was there or could there be a perception by the public of undue influence. And I find that a reasonable minded citizen could *36 have such a perception, a perception that a mayor, bringing application to the planning board, might have undue influence upon the members.
Now, again, I'll repeat, I'm not impugning the integrity of the members of the planning board. As a matter of fact, in one of the transcripts of one portion of the transcript, one member of the Planning Board was very upset and he said quite bluntly and visually, his tone, when he said are you impugning my integrity. He had taken an oath and he was going to follow that oath.
I don't want to, in any way, have anybody infer that I'm questioning the integrity of any of the members of planning board. They were sworn to uphold their position as members of the Board and I have no doubt that they did; but the perception here of a public official and the Board members he appoints is one that concerns this court.
Public perception here would be that the mayor influenced members of the Board and the case law cited and the facts of this case lead this court to remand the application to the planning board.
A number of cases that I've reviewed, some of those that I've cited, contain reversals or invalidation of inaction of the Board but I'm not going to do that for the following reasons: Mr. Rizas is no longer the mayor of the municipality. The perception of undue influence on his part will no longer remain.
I'm satisfied, again, the planning board has jurisdiction to hear the matter. It can be remanded and will be remanded to the Board. The matter can start afresh. I do not know and I'm not concerned if the same members of the Board that existed at the time of application are still on the Board. But it must be free of taint. And I think this is the only way that it can be done.
We fundamentally agree with his concerns.
In addition to the conflict of interest grounds, the objectors-appellants raise a number of other points on this appeal. On his cross-appeal, Mayor Rizas contends, of course, that he was entitled to the approvals as a matter of legal right and that the remand should be reversed. The objectors claim that: (1) six apartments, representing two-thirds of the building, could not possibly be an accessory use under any reasonable understanding of the ordinance as it should be construed and applied in this community; (2) the changed or "new" plans were not filed as required, ten days before the hearing date; (3) the amended application involved a substantial change in the plans which required new notice and publication; (4) the change in meeting dates from July 26 to July 12 was improper; (5) the Board's rejection of the recommendation of the Board of Architectural Review was an improper abuse of discretion; (6) inadequate findings were made by the Board; and (7) studies and *37 recommendations in the Township's and Planning Board's possession on traffic impact and parking were not revealed to the public.
We are satisfied that the decision to remand the matter to the Board to begin the application process afresh was appropriate in this situation. All of the points raised by the objectors on this appeal were decided in the applicant's favor at the Board level. The Board's decision on each point was highly discretionary. We affirm the decision to remand with one modification. We conclude that the Board should again consider the so-called "jurisdiction issue" of whether this proposal was indeed an accessory use in the HDC zone, or whether it required a use variance per N.J.S.A. 40:55D-70(d) and zoning board approval. This decision should be made in light of all of the evidence which no doubt will be presented at the new hearing.
This "accessory use" provision in the HDC zone is not the usual provision found in zoning ordinances. See Charlie Brown of Chatham, Inc. v. Bd. of Adj., 202 N.J. Super. 312, 324, 495 A.2d 119 (App.Div. 1985). Apartments are not a permitted principal or conditional use in this zone and are not regulated specifically, a circumstance which we suppose makes site plan considerations even more critical and discretionary. Apartments are allowed in the HD-Mixed Residential zone and the HD-Transient Residential zone where their development is strictly regulated by ordinance to cover density, parking and similar public safety and health considerations. The lack of regulations of apartments in the HDC zone serves to emphasize the importance of the residential accessory use definition as "incidental, subordinate and accessory." We conclude that the very peculiarity of the ordinance and the particularized circumstances of this unique community[1] require a complete reconsideration for this application.
*38 We agree with Judge Haines' statement in Bell v. Tp. of Bass River, 196 N.J. Super. 304, 314, 482 A.2d 208 (Law Div. 1984), that a local board is well equipped to address disputes which involve questions as to the interpretation of zoning regulations. "Local insight and local knowledge may make valuable contributions to decisions." Ibid. Interpretation of legal issues in the particular factual context may be performed by each board, subject to de novo review by the court. See Urban v. Planning Bd., 238 N.J. Super. 105, 111, 569 A.2d 275 (App.Div. 1990), aff'd as modified, 124 N.J. 651, 592 A.2d 240 (1991). And we may give substantial deference to a municipal agency's interpretation of its ordinances where that decision is informed by knowledge of local circumstances and is combined with enforcement responsibility. Somers Assoc. v. Gloucester Tp., 241 N.J. Super. 323, 342-343, 575 A.2d 20 (App.Div.), certif. den. 122 N.J. 355, 585 A.2d 366 (1990); W. Cox, Zoning and Land Use Administration § 4-4.2, at 52; § 4-4.4, at 54-55 (1991). *39 But we think the best view of the local perspective in this case will be obtained from a completely fresh consideration.
The highly discretionary nature of the many questions raised during the course of this application procedure, the rigorous contest of the issues at each level, and the pertinent legal authorities all counsel a new consideration of the issues, free from potential taint. In Place v. Bd. of Adj. of Saddle River, 42 N.J. 324, 200 A.2d 601 (1964), our Supreme Court affirmed the denial of a dimensional variance for a fallout shelter by the Zoning Board of Saddle River on the ground that the applicant had no legal entitlement to zoning relief. At the conclusion of the opinion, the Supreme Court commented emphatically on the ethical problem presented because the mayor of Saddle River, a member of the Bar, had appeared before the board of adjustment in the matter on behalf of a private client who objected to the application for variance. The Court agreed "with the plaintiffs that the appearance of the mayor was patently improper," id. at 332, 200 A.2d 601, noting that the mayor appoints the members of the board with the advice and consent of the council. The Court relied specifically on the language of Judge, later Justice, Francis in Aldom v. Borough of Roseland, 42 N.J. Super. 495, 500-501, 127 A.2d 190 (App.Div. 1956), where he said:
A public office is a public trust. Borough councilmen, as fiduciaries and trustees of the public interest, must serve that interest with the highest fidelity. The law tolerates no mingling of self interest; it demands exclusive loyalty.
In Place, 42 N.J. at 333, 200 A.2d 601, the Court concluded that "the appearance of a mayor for a private client who objects to the grant of a variance has the likely capacity to influence the action of the board, and in any event creates doubt in the public mind as to the impartiality of the board's action." In the case before us, the Mayor himself was the private applicant. Notably, the Court stated in Place that if the board's decision "required a review of the board's exercise of its discretion, we would not hesitate to set aside its decision because of the mayor's appearance." Ibid. (emphasis supplied). *40 Since the application in Place was patently without merit and was denied on legal grounds, discretion did not enter into the board's decision and reversal was not necessary to insure the integrity of the result reached by the board.
As we have pointed out concerning the case before us, a number of the decisions in the procession towards final approval in this matter invoked the discretion of the Planning Board. All were decided in favor of the Mayor-applicant, including the most critical, the construction of the meaning of an "accessory use" in the rather unusual context of this Historic District-Commercial zone and to this particular application. In Place, the Court specifically cited Van Itallie v. Franklin Lakes, 28 N.J. 258, 269, 146 A.2d 111 (1958), where the Court said that "courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism." The Court prudently cautioned that a "remote and nebulous interest" should not abrogate municipal action, ibid., surely because an oversanctimonious approach could cripple local government.
We find that the Mayor's role here as the developer-applicant on this controversial project, calling for close judgment by his political colleagues, is a situation much closer to counseling setting aside the Board's action as potentially tainted, than condoning a "remote and nebulous" interest which must be tolerated for practical reasons. As noted in Lafayette v. Bd. of Chosen Freeholders, 208 N.J. Super. 468, 473, 506 A.2d 359 (App.Div. 1986): "The potential for psychological influences cannot be ignored." See also Darrell v. Governing Body of Tp. of Clark, 169 N.J. Super. 127, 132, 404 A.2d 346 (App.Div. 1979), aff'd, 82 N.J. 426, 413 A.2d 610 (1980), where we looked askance and "voice[d] our vigorous and unequivocal disapproval of the action of one who deems himself disqualified from a vote but nevertheless uses his office, and whatever influence he may wield, to influence the votes of others."
*41 We also reject any notion that the "doctrine of stern necessity" condones a more tolerant attitude on our part. See United States v. Will, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (federal Supreme Court Justices had to hear challenge to federal pay-raise bill which included the Supreme Court). The Mayor here was under no necessity or compulsion to seize upon and promote development opportunities in his town during his waning term which ended on December 31, 1989, only a few months after this approval was formally granted in August. He could have at least refrained and waited until his term expired to seek relief and approvals from this Board when he no longer was the Township's chief executive. Any necessity here was self-induced because the Mayor acquired the property in fee specifically for development, unconditioned as to municipal approvals, during his term of office.
We do not suggest that the Mayor or any member of the Board is automatically disqualified from making any application for relief, for instance, for a dimensional variance to their homes for a modest addition or an acknowledged accessory use.[2] Certainly, if such necessity compels an application then all appointees of the Mayor on the Board, and all advisors to the Board in whose appointments the Mayor participated, should stand aside. We do hold that the Mayor should not pursue planning and zoning approvals for his own private *42 development and commercial rental businesses while holding office without running the risk of judicial abrogation of those approvals as potentially tainted. Positions of public trust call for circumspect conduct. In re Opinion No. 415, 81 N.J. 318, 324, 407 A.2d 1197 (1979). We subscribe, in this kind of circumstance, to the adjuration relied upon by the Law Division judge in his oral opinion remanding this matter to the Planning Board so it "can start afresh" on the application process since the Mayor left office on December 31, 1989:
One of the growing areas of concern in respect to conflict of interest is the doctrine of the appearance of conflict. While not many cases have turned on the issue of appearance of conflict, it nevertheless is important to avoid the appearance of conflict to the extent that such appearance diminishes public confidence in government and also may be of significant political embarrassment to the public official involved. Perhaps the best standard to use in assessing the appearance of conflict is the following:
Would an impartial and concerned citizen, intelligent and apprised of all the facts in the situation, feel that there was the potential for non-objectivity on the part of the officeholder making a decision? If the answer is affirmative the appearance of conflict exists. [34 M. Pane, N.J. Practice, Local Government Law § 344, at 416-417 (1987)].
The judgment of the Law Division remanding the matter to the Planning Board is affirmed with the modification that the Board shall also reconsider the threshold jurisdictional issue of whether the applicant's proposal meets the accessory use standard in the local ordinance or requires a use variance from the Zoning Board of Adjustment. The cross-appellant Rizas must submit an entirely new application to the Planning Board.
NOTES
[1] For a bit of history: "Founded in 1869 by Methodists as a religious summer colony, the town of Ocean Grove was for 100 years run by the Methodist Camp Meeting Association. In 1979 the state supreme court declared Ocean Grove's government unconstitutional, and Ocean Grove became part of Neptune Township. At that point most of the community's strictly enforced blue laws, which included Sunday prohibitions against driving (the gates leading into the community were closed at midnight Saturday), bicycle riding, boating, swimming, and hanging laundry outside, no longer applied. It is still the case, however, that no alcoholic beverages can be sold or served, and that no one is allowed on the beach on Sundays until the church service is over. Many residents of the community, which has a population of about 6,000 in winter and 30,000 in summer, are supporting movements either to secede from Neptune or to get the township to issue special ordinances that apply only to Ocean Grove.

Ocean Grove's historic district (the area between Main St., the Atlantic Ocean, and Wesley and Fletcher lakes) is distinguished by its generally homogeneous Victorian look. Permanent tents (actually houses extended in the summer by tents) are clustered around the Great Auditorium; there are fine old hotels with porches on Ocean Ave.; the street signs are made of tile. The auditorium (54 Pitman Ave.; XXX-XXX-XXXX), a magnificent pile built in 1894 and now a national landmark, seats 7,000; ..." [B. Westergaard, A Guide to the State 249-251 (Rutgers 1987)]. See also State v. Celmer, 80 N.J. 405, 410-413, 404 A.2d 1 (1979); Schaad v. Ocean Grove Camp Meeting Assoc., 72 N.J. 237, 254-258, 370 A.2d 449 (1977).
[2] Since the decision on this matter in the Law Division, the Legislature has adopted the "Local Government Ethics Law," N.J.S.A. 40A:9-22.1 to -22.27; L. 1991, c. 29, effective date May 21, 1991. This statutory code of ethics permits a local official to represent his own interest in a proceeding. N.J.S.A. 40A:9-22.5(k). The Local Finance Board is told in the statute that when "interpreting and applying the provisions of this act" it should recognize that "standards of conduct shall distinguish between those conflicts of interest which are legitimate and unavoidable in a free society and those conflicts of interest which are prejudicial and material and are, therefore, corruptive of democracy and free society." N.J.S.A. 40A:9-22.4. The statute also prohibits a local government official from engaging in any "business, transaction, or professional activity, which is in substantial conflict with the proper discharge of his duties in the public interest." N.J.S.A. 40A:9-22.5(a).