881 A.2d 784 (2005)
380 N.J. Super. 216
ACORN MONTESSORI SCHOOL, Plaintiff,
v.
BETHLEHEM TOWNSHIP PLANNING BOARD, Defendant.
Superior Court of New Jersey, Law Division, Hunterdon County.
Decided January 13, 2005.
*785 James H. Knox, Clinton, for plaintiffs.
William R. Sutphen, III, Somerville, for defendant.
BUCHSBAUM, J.S.C.
This is an action in lieu of prerogative writs in which plaintiff Acorn Montessori School challenges certain restrictions and conditions set forth in a December 8, 2003, resolution of the Bethlehem Township Planning Board. That resolution granted in part and denied in part Acorn's application for preliminary and final major site plan approvals. The decision resulted from long, drawn out and apparently controversy-filled hearings which took place on twelve nights between March 10, 2003, and November 24, 2003.
By order dated June 4, 2004, the review of the decision of the Board was bifurcated.
This proceeding will address Acorn's challenge to those portions of the resolution, namely ¶¶ 9 through 12 inclusive, that deny the portions of the application seeking approval of a personal residence on the premises for an employee of the school, and for inclusion of pre-school, after school and summer programs. The later proceeding will address Acorn's challenge to certain of the conditions placed by the Board on the operations of its approved school programs.

FACTS

1. The Application
The essential facts regarding the application were not in dispute, although the Applicant and the Board differ as to the conclusions to be drawn therefrom. The *786 basic application was for a primary school for ages three and older with pre-school, after school and summer school programs.
Certain changes were effectuated during the lengthy hearings. Plaintiff requested a home for a full-time employee of the school who would be in charge of security and maintenance on the school grounds. Initially, the request had been for a person to run the farm operation that Acorn had initially proposed in connection with the property. However, when the Board determined that the farm operation, under Bethlehem's ordinance, would constitute a second use on the property requiring a use variance, the request for the farm operation was discontinued. Accordingly, with respect to the residence, the application was for a residence to house a maintenance and security employee.
The nature of the application for the summer school also changed somewhat during the course of the hearings. Initially, pursuant to a memo by Elizabeth McKenzie, Acorn's planner, the summer school was essentially going to be recreational in nature. However, in response to the concerns of the Board that a recreational camp use might not be a permitted use, Acorn amended its application during the course of the hearings. Instead, Acorn asserted that the summer program would have a primarily educational, not recreational, focus. Accordingly, the nature of the Acorn programs for pre-school, after school and summer school were all asserted by Acorn either to have an educational focus, or to constitute child care as an accessory use to the school's educational programs.
Although, as noted above, the Board's review lasted through twelve hearings, the bulk of the testimony concerning the three programs at issue was given in a few hearings by Susan McCartney, the prospective administrator of the proposed school, and Lisanna Follari, an early educational specialist familiar with the Montessori programs who testified later in the proceedings to address the Board's concerns regarding the pre-school and summer school programs.

2. Background Information
There was testimony from McKenzie, and engineer Alan Thompson, P.C., describing Acorn's proposal. Essentially, according to McKenzie, the Montessori Foundation is a nonprofit organization dedicated to the advancement of Montessori education in the United States and abroad. The mission of the Montessori Foundation is to nurture, inspire, and support the development of strong, successful Montessori schools around the world. Montessori schools are private institutions, which seek to expand the learning process of younger children.
The Acorn Montessori School owns Lot 6 in Block 37 in Bethlehem Township, Hunterdon County. This property is approximately 27.4 acres and is located at the intersection of Norton Church Road and Mountain View Road in Bethlehem Township. Currently, there are two structures on the property, a residence which is occupied and a barn type structure. The MR zone in which the property exists is a zone in which schools are permitted as of right; § 102-13 of the Township's Land Development Ordinance allows as a permitted use in the MR zone "public and private day schools of elementary and/or high school grades licensed by the State of New Jersey."
The existing buildings on the site will be incorporated into the overall school design and there are plans for construction of a new classroom building, encompassing over 14,000 square feet. The project would be constructed over three phases and the existing buildings would house the *787 school until the new building is constructed. All of the buildings currently on the site will be used even after the new building is constructed; the current buildings will become accessory to the new classroom building. The site, per McKenzie, has only one proposed use with different components, including occupation of the existing dwelling by an employee of the school who would be responsible for security and maintenance.
Thompson, applicant's project engineer and a licensed engineer in New Jersey, likewise testified that the zone is a mountain residential (MR) zone, defined as a residential use zone permitting public and private schools. The requirements of an MR zone include a three-acre minimum lot, frontage of 250 feet, lot width of 250 feet, lot depth of 300 feet, front yard setback of 75 feet, side yard setback of 50 feet and a rear yard setback of 100 feet. Thompson testified that all of the setback requirements would be met, except for the existing dwelling. The proposal would include thirty-eight parking spaces, and a 19,000 square foot trailer temporary structure, which would be utilized until the completion of the main structure and then removed. The main building construction is not the only new construction planned; there will also be a basketball court, a greenhouse and a playground area.
Thompson asserted that there were no variances required in connection with the new construction. The Board accepted this finding as to the physical aspects of the proposed school.

3. Pre-kindergarten Programs
McCartney testified first concerning this subject. She currently serves as the administrator of a Montessori School in Clinton Township. She is roughly analogous to the principal of the school, having control over the curriculum, administration, finance and discipline. She explained the Montessori philosophy concerning schools, which involves an open environment covering the basics of education, but also an outdoor environment.
With respect to the pre-school program, she emphasized that Montessori considered that its primary school consisted of children of ages three and four, who were pre-kindergarten, as well as five- and six-year-olds who would qualify for kindergarten. Thus the Montessori program treated the initial stages of education from age three through age six as a unity, where children of different ages attended school together. As she stated:
A. It is a multi-age classroom and it is a developmental educational process. That starts at age three in every area, in language, mathematics, I can go through this and tell you about the three year olds.
Q. Give us a few examples.
A. A few examples? In handwriting, young children practice making letters from the time of their first exposure into writing at age three or four. In spelling, children begin to spell using moveable alphabet to sound out and spell words when they first learn to read at age three and four. In mathematics, students are typically introduced to numbers at age two, and number symbols one to ten. Introduction to the decimal system typically begins at age three or four. In geometry, the sartorial exploration of plain and solid figures at the primary level of age three to six, the children learn to recognize the names of basic shapes used in solid geometry. Geography, the primary globes for the very young child are introduced in two or three year olds, maps of land forms are introduced at age three, cultural geography, countries are studied in many ways at all levels at Acorn. Science[,] *788 differentiation between living and non-living things is something they do at age three. Classification of animals and plants starts at age three. The first puzzles representing biological parts of flowers, root systems, trees or anatomical features on animals are first used by very young children as puzzles and then vocabulary.
When asked, McCartney indicated that the pre-school-age children would spend most of the day doing the kinds of activities she had described.
After the Board had expressed concern as to whether this program constituted childcare, not education, the early childhood education expert, Follari, testified.[1] Follari has a bachelor's and a master's degree from Rutgers University in early childhood education. She is currently working on her doctorate and has held several positions in the early education field. Her graduate degree program focuses on different methods of early childhood education.
Follari gave extensive testimony on October 27, 2003. She opined that early education program proposed for three- to six-year-olds of the type that had been described at length was in fact part of elementary education. As she stated:
[E]arly childhood and elementary are really intermeshed in that, and you can see the range of that when we talk about in New Jersey specifically our teaching certification programs which cover preschool through third grade. If you are an early childhood certified teacher, that is the range you are certified to teach. Elementary programs overlap that, and cover kindergarten through eighth-grade programming, so there is a lot of intermeshing of the two together.
Q. With regard to the Montessori schools, have you had an experience in evaluating those types of programs?
A. Studying Montessori education is part of my graduate work both Master's level as well as the Doctorate level. It is something I explored by researching, and the research out there, Doctor Montessori's own writing as well as going in and visiting Montessori schools, I have done some at the existing school program in Clinton as well as other Montessori programs around the state.
Q. And is there anything about the Montessori program that particularly involves early education?
A. Everything about Montessori education. To know Doctor Montessori's vision for early childhood programs is to see the academic component. She was very clear, very focused on the intellectual nature of her brand of early childhood programming. Of all the domains of the development, the cognitive development, intellectual engagement with young children was foremost in her vision and in mapping out the program.
No rebuttal was offered to this testimony. The Board's current assertion that "education was not a primary purpose" of the pre-school "when children of different ages were grouped together" is not supported by any testimony in the record.

4. Summer School
As the Board now states, the nature of the summer school program changed over time. However, this court will focus on *789 the program as finally presented to the Board. McCartney discussed a summer curriculum, which would emphasize sciences, environmental studies, cultural heritage, fine and performing arts, mathematics enrichment and language enrichment. Story telling, music, dance, arts and crafts, structured sports and nature studies will be included. The teachers will be year-round Acorn teachers in addition to specialists in various areas of studies. Children attending the summer program would receive report cards and a portfolio of their work at the end of each session of summer school and parents' conferences would be available at all times. The program, according to McCartney, would involve "2 hours in the classroom and up to 4 hours outdoors." However, the testimony was that the outdoor and indoor programs would be integrated; that is, that some of the outdoor programs would be educational. McCartney also made it clear that the summer program in Bethlehem would not be identical to a summer program sometimes advertised as a camp in Clinton Township. There would be a change of focus in that "it is more related to academic subjects for long periods of time." She also advised the Board that there would be Montessori instructors in math, language and science using the same classrooms as used during the school year and that students of all ages in the summer program would spend the bulk of their time working on such things.
Follari opined on October 27, 2003, as to the educational value of the summer program. She cited the "growing body of research on the summer lag, the summer loss in terms of children's academic development, their intellectual development, and it has been documented that there has been loss at some time when educational programs cease." She remarked that "academic programs that are running through the summer have been explored and it has been `found that such programs can alleviate backsliding and maintain a level of academic achievement.'" With respect to the proposed Montessori program, she gave, without objection, the following opinion which described the summer curriculum:
Q. Is there a program which, in your judgment constitutes a summer education program, or would you characterize it more as a summer camp?
A. Based on what is laid out in this curriculum here, there are a couple of reasons why this is more of an academic nature, and those are that they continue to utilize the same trained teachers they use throughout the academic year. The activities that they have outlined in this guide here, this curriculum is more of an academic and cognitive element, as well as they are holding themselves accountable through a portfolio assessment such as a report card system.
Again, there was no rebuttal testimony to either witness. One Board member, in questioning Follari, seemed particularly to focus on the issue of whether some of the activities done during summer school could also have been done during camps he had personally attended. He did not, nor did any other testimony rebut the facts concerning the Montessori summer program. Nor was it explained why the fact that an activity could be also done in a summer camp would make it per se non-educational.

5. After School Program
Only McCartney testified with respect to the after-school program. That testimony consisted of her statements that some children would stay until late in the afternoon, *790 sometimes as late as 6 p.m. As for this program, McCartney testified as follows:
[I]t is a continuation of school. They [the children] don't have the formal lessons that have between 9 and 3, but they are in the same classroom using the same materials in the morning with other children with Montessori teachers.
McCartney also said that "it is the same children there during the day that don't go home."

6. Residence on Site
The testimony on this subject was comparatively brief. The existing main dwelling on site has been set aside for a caretaker/security person. The person would be a school employee. Ms. McCartney testified that such a person would do maintenance tasks. She also felt that twenty-four-hour security was important. There already have been several incidents of vandalism at this site.
She did note that on another site operated by Acorn, in Clinton, there was not twenty-four-hour security.

7. The Resolution
The Board dealt with the pre-school, after-school and summer school programs in discrete paragraphs of its resolution. The Board found that the residence on the property was not an accessory use because there was no "clear and convincing testimony" as to the specific reasons for such use. Resolution, ¶ 9A. The Board added that there was no testimony which would support the position that the residence was required for maintenance/security or that such use was incidental or customary at other public or private schools. Id., ¶ 9D.
With respect to the after-school program, the Board stated that it was child care, not education. Further, it was not an accessory use to a non-profit day school. Id., ¶ 10A.
Again, the Board imposed a requirement for "clear and convincing testimony" to show that the after-school activity was customary for a public school. The Board declared that there was no such evidence that after-school programs are offered currently in public schools, as contrasted with independent day care centers, so that the proposed after-school program was a separate non-educational child care use. Id., ¶ 10B.
The Board similarly rejected the proposal for pre-kindergarten age children. In ¶ 11A of its resolution, the Board again required clear and convincing evidence of educational benefit and relied on the circumstance that no such pre-school programs were offered in public schools. Thus, these programs, according to the Board, constituted a separate day care activity which was apart from the permitted resident school use. Id., ¶ 11A. The Board also held that pre-kindergarten education is not a permitted use in the zone and therefore could not be an accessory use, finding that there was no clear and convincing evidence that education programs for pre-kindergarten children are incidental or customarily related to the use of any public or private non-profit day school. Id., ¶ 11B & C.
Finally, with respect to the summer school program, the Board again found it to be day care which was not part of the permitted use. Id., ¶ 12A. It again required clear and convincing testimony that such use was incidental to and customarily related to schooling. Id., ¶ 12B. With respect to this program, the Board also found that it would not be educational since a majority of the time each summer day involved self-care, socialization and outdoor activities and children of different ages. Id., ¶ 12C. It also found that typical *791 summer school programs were remedial, unlike the proffered programs.
However, in the resolution, the Board did not cite any evidence conflicting with that offered by Acorn regarding any of the three programs. There was none, in fact. There was no educational expert called by the Board. Instead, it based its findings solely on the facts proffered by the applicant and its rejection of same, typically for failure to provide clear and convincing evidence that the after-school, pre-school, and summer programs were educational programs covered by the ordinance. The Board also deemed day care to be a totally separate use which could not be approved as an accessory use. As it had with the farm, it rejected day care as a second use of the property which could only be obtained by a use variance, presumably for the establishment of dual uses on the property.

LEGAL ANALYSIS

1. Standard of Review
The first question is the standard of review. Plaintiff contends that this case involves: (1) the definition of education as a question of law, that is, an interpretation of an ordinance, and (2) that no deference is to be given to the Planning Board's decision as to whether the residence, or the various affiliated programs, were part of the use or accessory to the educational use. In response, the Board states that its fact findings are entitled to deference.
The case law on this subject, while not entirely clear, supports plaintiff's view. Jantausch v. Borough of Verona, 41 N.J.Super. 89, 96, 124 A.2d 14 (Law Div. 1956), aff'd, 24 N.J. 326, 131 A.2d 881 (1957). Such cases as Grancagnola v. Planning Board, 221 N.J.Super. 71, 533 A.2d 982 (App.Div.1987) (Skillman, J.A.D.), and Cherney v. Zoning Board of Adj., 221 N.J.Super. 141, 534 A.2d 41 (App.Div. 1987), strongly declare that courts will review de novo decisions of local boards interpreting ordinances. For example, in Grancagnola, supra, the court held that "the interpretation of an ordinance is purely a legal matter as to which an administrative agency has no peculiar skills superior to the courts." Id. at 75, 533 A.2d 982.
Other cases, such as Rowatti v. Gonchar, 101 N.J. 46, 500 A.2d 381 (1985), appear to require deference to factual determinations of an administrative agency even where the interpretation of an ordinance is involved. Rowatti, supra, at 51-52, 500 A.2d 381. See also Wyzykowski v. Rizas, 254 N.J.Super. 28, 38, 603 A.2d 53 (App.Div.1992), modified in part on other grounds, 132 N.J. 509, 626 A.2d 406 (1993). However, as stated in Wyzykowski, deference is appropriate only where the local decision is informed by knowledge of local circumstances. Id. at 38, 603 A.2d 53 In addition, Cherney suggests that likewise it takes disputed facts to justify deference to a Board's findings concerning an interpretation of an ordinance. Cherney, supra, 221 N.J.Super. at 144, 534 A.2d 41. It was also stated by the Law Division in Colts Run Civic Ass'n v. Colts Neck Twp. Zoning Bd. of Adj., 315 N.J.Super. 240, 717 A.2d 456 (Law Div.1998), that while the reviewing court should give certain deference to a municipal agency's interpretation of its ordinance, such determinations are always subject to de novo review by the court, id. at 246-247, 717 A.2d 456, particularly where there are only undisputed facts.
It is evident in this case that the Board's determinations were not based on credibility, resolution of disputed facts or knowledge of particular local conditions. This is not a situation where the Board's experience with the Township's master plan, or the actual development of the ordinance, *792 inform the Board's decision concerning the facts presented.
Instead, the issues involved in this case are primarily ones of educational definition, and are based on undisputed factual circumstances. The resolution of such issues did not require any particular land use expertise on the part of the Board or any particular interpretation of the land use issues posed by alternate potential definitional approaches. Accordingly, since facts are not disputed, and involve no land use expertise, the Board's interpretation of its ordinance is subject to de novo review as a legal issue.

2. Educational Use
The legal issues concerning the pre-school, after-school and summer programs are two-fold. First, are these programs part of the educational use explicitly permitted by the ordinance? Second, if they were not part of that use, are they accessory to it and thus permitted as an implied accessory use?

A. Introduction
The testimony concerning the educational emphasis of the summer and pre-school programs was one-sided. The unrebutted conclusions of both Acorn witnesses were that the nature of the educational experiences made them part of the school program. In brief, the above-quoted testimony about the unified educational program for the three-to six-year-olds was never questioned. As to the summer program, there was testimony that all the activities were related to an educational effort.
In response, the Board's support of a "clear and convincing testimony" standard in Acorn is without merit. There is no such standard.

B. Summer School
Further, the Board's use of the percentage of a day's activity as the sole standard for the educational value of the summer program is without foundation. As recounted above, both McCartney and Follari testified without contradiction that there was considerable direct educational time, and that regardless of the time involved there was an integrated educational theme to the summer program which made it an educational experience. In addition, the citation by one Board member of his experience in camp was not probative. Of course, those experiences were not subject to any cross-examination. Nor is it appropriate for any member of the Board to rely so heavily on personal experience which was not tested in the record.

C. Pre-School
As to the pre-school program, the fact that ages three through four were involved as well as ages five and six should not have been determinative. There is clear evidence that the Montessori philosophy included three- and four-year-olds as part of the elementary phase of education. Again, there was no rebuttal to this testimony. Nor is there any testimony that three- and four-year-olds were incapable of receiving elementary education at the level offered to it by Montessori.
In addition, while Bethlehem is not a lower-wealth "Abbott" district, the court finds that the Supreme Court has largely adopted the educational analysis set forth by Acorn Montessori here that there is a close correlation between the education needs of pre-school children and elementary school children. Abbott v. Burke, 153 N.J. 480, 507, 710 A.2d 450 (1998). In Abbott, the Supreme Court found a strong relationship between elementary and pre-school education:

*793 Stated conversely, because the absence of such early educational intervention deleteriously undermines educational performance once the child enters public school, the provision of pre-school education also has strong constitutional underpinning.
[Ibid.]
Thus, this court's conclusion based on Acorn's testimony herein finds support in Abbott.

D. Role of Expert Testimony
Moreover, the Board is simply not free to ignore expert testimony in the record. While not bound by it, it cannot arbitrarily reject it. Exxon Co. U.S.A. v. Bd. of Adj. of Bernardsville, 196 N.J.Super. 183, 481 A.2d 1172 (Law Div.1984). That court found, in a case incidentally involving, applicant's planner in this case, that a mere statement that an expert's report "was unconvincing" simply did not suffice. Here in fact not only was there no adverse expert testimony to that proffered by Follari, there was not even any lay testimony in opposition to the conclusions concerning the summer and pre-school programs.
Under the circumstances, it could be found that the Board's factual rulings on the summer and pre-school were arbitrary and capricious and without substantial evidence in the record, were such a finding necessary. Kramer v. Zoning Bd. of Adj. of Sea Girt, 45 N.J. 268, 212 A.2d 153 (1965). Clearly, as here, where de novo review is appropriate, the lack of any evidentiary support for the Board's conclusions concerning the pre-school and summer school program cannot be countenanced. As the experts found, it is simply too late in the day with respect to our knowledge of educational processes to assert that a pre-kindergarten program bears no relationship to an elementary educational program or that summer school can only be remedial and cannot be otherwise educational. To assert the educational value of such programs in the twenty-first century is simply to assert the obvious.

E. After School Program:
With respect to the after-school program, there was sufficient, albeit brief testimony from McCartney alone that the after-school program would be a continuation of the day program. It is inconceivable in this day of latchkey children that the continuation of a school day to accommodate parents would not be considered part of a school program. Again, the testimony, as well as common sense, is one-sided. If children are kept at school until 6:00 p.m., rather than being released at 3:00 p.m., the fact that they are in the same classrooms with the same materials available is surely conclusive. On this record, it is difficult to understand how a finding that such programs are not educational could survive even arbitrary and capricious analysis, let alone a de novo review.
Accordingly, this court finds that the ordinance allowing for educational and secondary schools in the MR Zone must be interpreted to permit applicant's proposed pre-school, summer school and after-school programs.

3. Accessory Use  After, Pre-and Summer School
Alternatively, these programs must be considered accessory uses. On one level, the analysis is really quite straightforward. N.J.S.A. 40:55D-66.7a provides that
Any child care program approved by a local Board of Education operated by the Board or by an approved sponsor in the public school, before or after regular *794 school hours ... shall be deemed a permitted use in all residential and non-residential districts of the municipality and shall be exempt from local zoning restrictions.
[N.J.S.A. 40:55D-66.7a.]
Thus, it is evident that were the same programs carried on by a public school, even if they were classified as childcare, they would clearly constitute mandatory permitted accessory uses.
Our land use law further provides that
no zoning ordinance governing the use of land by or for schools shall, by any of its provisions or by any regulation adopted in accordance therewith, discriminate between public and private non-profit day schools of elementary or high school grade accredited by the State Department of Education.
[N.J.S.A. 40:55D-66b.]
Under this anti-discrimination statute, clearly, an activity which a public school is allowed to undertake cannot be denied to a private school. Accordingly, since a public school can undertake day care activities through pre-school, after-school or summer programs, then under the anti-discrimination provision applicable, a private school must be afforded the same latitude.
Defendants respond that the anti-discrimination statute does not mean what it says with respect to day care operated by private schools. The Board points to the fact that the day care zoning mandate was adopted in 1999, after the anti-discrimination section, which was included in the Municipal Land Use Law in 1975. While it is true that L. 1999, c. 83, which enacted N.J.S.A. 40:55D-66.7a, did not mention private schools and it is further true that the anti-discrimination provisions of N.J.S.A. 40:55D-66b pre-date 1999, no inference can be drawn from that concatenation of circumstances to negate the literal wording of the two statutes. State v. Malik, 365 N.J.Super. 267, 839 A.2d 67 (App. Div.2003). Taken on their face, the statutes very simply require municipalities to permit day care at private schools. That requirement was facially ignored by the Board.
Further, the principle of nondiscrimination between public and private schools is deeply rooted in the land use jurisprudence of our state. Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus, 42 N.J. 556, 202 A.2d 161 (1964). In that case, a landmark in the field of land use, Justice Hall suggested that the issue of discrimination against a private school was both constitutional and statutory. He cited the relevant education statutes as evidencing the Legislature's concern for non-profit or private schools, which furnish elementary and high school education. Id. at 565-566, 202 A.2d 161.
Moreover, there is no indication in the legislative history of L. 1999, c. 83, of any intent to limit the scope of the anti-discrimination statute. In fact, some relevant legislative history, namely that of Chapter 278 of the Laws of 1991, suggests quite the contrary. That law enacted N.J.S.A. 40:55D-66.5b, which provides that family day care centers shall be a permitted use in all residential zones. The statement by the Assembly Municipal Government Committee to the bill which eventually became c. 278 states that "the public policy to promote affordable community day care options is deemed to be so compelling" that the bill would actually override not only zoning requirements but also deed restrictions.
This concern for child care is consistent with the 1989 report to the Legislature prepared by the New Jersey Child Care Advisory Council. That report which appears to underlie the plethora of child care *795 legislation enacted in the late 1980's and early 1990's stated as follows:
The long-range goal of the Council will be to expand and enhance child care programs and services for the children of all families who need child care in the State of New Jersey. The Council will encourage individuals, organizations, foundations, employers and corporations, and governments to establish and support appropriate child care programs and services that will offer the opportunity of equal beginnings for all infants and young children who need early education and child care, and provide safe and satisfying places for school age children before and after school and during times when the public school is not in session. [New Jersey Child Care Advisory Committee, Child Care in New Jersey: A Report to the Legislature, at 23 (April 1989) (emphasis added).]
Given this compelling expression of public policy, the defendants' effort to exempt private school operated day care from the reach of anti-discrimination statute, N.J.S.A. 40:55D-66b, cannot be sustained.
More broadly, it is by now well recognized, see, e.g., Lusardi v. Curtis Point Prop. Owners Ass'n, 86 N.J. 217, 430 A.2d 881 (1981), that state policy considerations do inform local land use decisions. In Lusardi the state policy with respect to recreational use of the waterfront overrode a local ordinance restricting the waterfront to residential use. In Lusardi, the court actually invalidated the local ordinance since it was felt to conflict with state policy regarding use of beaches for recreational purposes.
In this case, the issue is not invalidation of the local ordinance but its construction. If anything, therefore, the deference given to state policy on day care should be greater in this case since it does not involve a direct, facial clash between state policy and local zoning. This case thus is highly analogous to Anfuso v. Seeley, 243 N.J.Super. 349, 371-73, 579 A.2d 817 (App.Div. 1990), which upheld a variance for a marina in a residential zone due to the state policy of encouraging recreational use of waterfront property.
Further, the numerous portions of the land use law which support day care as permitted uses underscore this conclusion that the linguistic reach of our nondiscrimination law cannot be curtailed as defendant advocates. See N.J.S.A. 40:55D-66.6 (mandating child care centers as a permitted use in non-residential districts); N.J.S.A. 40:55D-66.7 (stating that childcare centers are not to be included in calculating floor area ratio limitations); N.J.S.A. 40:55D-66.5a and b (cited above, mandating family day care as a permitted use in all residential districts, so as to eliminate "zoning barriers" to day care). This court cannot agree that a Legislature which enacted these many provisions favoring day care would have implied that a municipality had the authority to discriminate in its zoning between day care operated by public schools and private schools.
The same result would be attained even under traditional land use approaches for review of accessory uses. The Board suggests that the lack of evidence of actual conduct of childcare facilities should control. However, even applying the typical land use tests for accessory uses, this court finds that the three programs, even if characterized as day care, are accessory uses. The test was described in State v. PT & L Constr., 77 N.J. 20, 389 A.2d 448 (1978), where the Supreme Court of New Jersey stated that two determinations must be made as to whether it is a proposed accessory use. These were "does the use bear a close resemblance and obvious relationship to the main use, and *796 whether such use is also a customary use". PT & L, supra, 77 N.J. at 26-27, 389 A.2d 448.
Later in Tanis v. Twp. of Hampton, 306 N.J.Super. 588, 704 A.2d 62 (App.Div. 1997), the test of impact was added to the earlier test of commonality set forth in PT & L. Tanis, supra, at 604-605, 704 A.2d 62.
In applying the commonality tests of PT & L, supra, it is clear that under the test it is not whether the proposed accessory use exists in the municipality where it is being sought. Rather, one looks at the pattern and what is permitted. "even if the use is found in only a small percentage of similar main uses, the use may still be found to be customary." PT & L, supra, 77 N.J. at 27, 389 A.2d 448. Compare this with Tanis, supra, which looked at the question of airstrips as an accessory use on a state-wide basis and did not discuss whether they were found in the Township of Hampton or not.
Similarly, Wright v. Vogt, 7 N.J. 1, 80 A.2d 108 (1951), stated that a 60-foot tower for personal use was within the spirit of residential uses, again, even though most homes in the residential zone did not have such towers. Too, in Place v. Bd. of Adj. of Saddle River, 42 N.J. 324, 200 A.2d 601 (1964), the Supreme Court of New Jersey held that a fallout shelter, even then a rather uncommon use, was a permitted accessory use to a residence and simply did not require a use variance.
Here, the anti-discrimination and day care provisions in the M.L.U.L. described above are clear legislative declarations that day care programs are to be deemed a common use along with schools, regardless of frequency.[2] This is an authoritative legislative determination as to commonality.
With respect to impact, per Tanis, there is ample case law that the impacts of programs such as those proposed by plaintiff are insufficient to disqualify them as accessory uses. Thus, in Three L Corp. v. Bd. of Adj. of Newark, 118 N.J.Super. 453, 288 A.2d 312 (Law Div.1972), the Law Division stated that such schools do not depart from the educational uses envisioned in the zones in question so as to impair the zone plan.
Private day care centers should be treated as community facilities rather than arbitrarily classified as proprietary uses, and should be considered as being comparable to elementary or public nursery schools for purposes of zoning. The very nature of the use i.e., educational, gives rise to special reasons pursuant to Kohl v. Mayor, etc., Fair Lawn, Supra, 50 N.J. at 279, 234 A.2d 385. Additionally, day care center services meet community objectives in much the same manner as other more familiar community institutions such as schools and public nurseries, even though the State did not see fit to make nursery level compulsory. A private nursery school serves, in addition to the educational function, an important social community purpose for mothers. Public nursery schools can be established by a board of education in any school under its control, pursuant to N.J.S.A. 18A:44-1. If a public facility is not provided in the district, the availability *797 of a local private nursery serves a legitimate education need, sanctioned, though not required, by the State.
[Three L, supra, 118 N.J.Super. at 459, 288 A.2d 312.]
Likewise, Shim v. Washington Twp. Plan. Bd., 298 N.J. Super. 395, 410, 689 A.2d 804 (App.Div.1997), held that day care centers were harmonious with public and parochial school uses in a particular zone. On that basis, the court found no substantial interference between the day care center and surrounding uses.
Accordingly, applying the traditional tests for accessory uses, it is clear that there is commonality between the day care use and the school use, and further, that the impacts of the day care use are well within the range of those anticipated for a school. In fact, the Board makes no claim of different impact.

4. On-Site Residence
A more difficult question is presented by the on-site residence. As to this item, there is no clear governing state policy as there is in favor of providing educational opportunity or expanding day care facilities. Nor is there any governing statute with respect to discrimination concerning such residency.
In support of its contention that the residence is an accessory use, plaintiff analogizes its case to the situation of a resident butler, maid, chauffeur or caretaker. Its cites, among other cases, Randolph Twp. v. Lamprecht, 225 N.J.Super. 236, 542 A.2d 36 (App.Div.1988). In Lamprecht, the court held that living quarters in a garage for a caretaker/chauffeur were accessory to the defendant's residential use of his premises. The court further found that the premises did not contain two separate independent living quarters contrary to the ordinance. Lamprecht, supra, 225 N.J.Super. at 237-238, 240, 542 A.2d 36.
However, Lamprecht is not controlling. That case involved a helpers' residence accessory to a residence. This case involves a non-residential use. In concept, given the school's non-residential character, there is no difference in kind between a residence attached to the school's use for security/maintenance purposes and a residence attached to any form of non-residential use, such as a factory, warehouse, or office building. The same arguments with respect to security and maintenance could be made for each such type of use. Yet, there is no testimony in the record, nor is the court aware of any evidence, that residential superintendents are a common feature of non-residential buildings. Accordingly the commonality test does not appear to be satisfied. Recognizing the Supreme Court's determination in PT & L, supra, 77 N.J. at 27, 389 A.2d 448, that even if the use in question is found in only a small percentage of similar main uses, it "may still be found to be `customary,'" and the fact that such review mandates a broader point of geographical reference than a single town, Colts Run Civic Ass'n, supra, 315 N.J.Super. at 252, 717 A.2d 456, there simply is no evidence in this record of significant commonality between an employee residence and a non-residential use.
It may well be that a board of adjustment, when presented with an application for an affiliated residence, might have to grant such an application as being incident to an inherently beneficial use. Cf. Med. Ctr. at Princeton v. Princeton Twp. Zoning Bd. of Adj., 343 N.J.Super. 177, 207, 778 A.2d 482 (App.Div.2001). However, that is for another application before a different board. Suffice it for the moment to assert that it is the court's holding that the residential use is not one that is customarily incidental to the non-residential *798 use and thus the Board properly rejected this portion of the application.
For the foregoing reasons, it is the determination of this Court that the decision of the Board of Adjustment must be reversed insofar as it precludes the Acorn Montessori School from operating the pre-school, after-school and summer school programs described in its application and as set forth in the record below. Thus, ¶¶ 10 through 12 of the Board's resolution denying these specific aspects of the application are hereby reversed. However, ¶ 9 of the Board's resolution denying authorization to locate a personal residence on the premises is affirmed.
Counsel for the plaintiff shall submit an appropriate order. A hearing will be held shortly on the plaintiff's challenge to certain other site plan conditions with a view towards resolution of the entire case as soon as practicable.
NOTES
[1] Although Follari was not formally accepted as an expert by the Board, her qualifications were not rebutted and she was allowed to give opinion testimony. Given that Boards need not comply with all formal procedures obligatory in courts and the fact that in substance Follari was treated as an expert, this Court will so regard her.
[2] It is noted that hereto the statutory scheme described earlier is relevant since the test for impacts is not the difference between what exists now and what is proposed, but rather between what is permitted now, even if it is not currently used, and what is proposed. Childrens' Inst. v. Verona Twp. Zoning Bd., 290 N.J.Super. 350, 675 A.2d 1151 (App.Div. 1996). Since school-based day care is permitted in any zone, any increase in traffic on site from school-related day care cannot be regarded as an inappropriate impact, which would disqualify the use as an accessory use.